776 So.2d 819 (1997)
Wayne Holleman TRAVIS
v.
STATE.
CR-92-0958.
Court of Criminal Appeals of Alabama.
April 18, 1997.
Rehearing Denied January 30, 1998.
*828 George K. Elbrecht and Robert C. King, Monroeville, for appellant.
Bill Pryor, atty. gen., and Ward Beeson and Cecil Brendle, asst. attys. gen., for appellee.
McMILLAN, Judge.
The appellant, Wayne Holleman Travis, was charged with capital murder for intentionally causing the death of Clarene Haskew during the course of a burglary, see § 13A-5-40(a)(4), Code of Alabama 1975. The appellant was found guilty as charged and, following a sentencing hearing, the jury returned an advisory verdict recommending death by electrocution. The final sentencing hearing was held before the trial court, which accepted the jury's recommendation and sentenced the appellant to death by electrocution.
*829 The facts relevant to the issues raised in this appeal are set out in the trial court's order sentencing the appellant to death, and the trial judge's findings of fact, pursuant to § 13A-5-47(d), Code of Alabama 1975, state, in pertinent part, as follows:
"On Thursday, December 12, 1991 the Defendant, WAYNE HOLLEMAN TRAVIS, and a codefendant, STEVEN WAYNE HALL, Jr., traveled by bus to Uriah, Alabama. They were picked up by Paula Shiver, a friend of Hall's, who took them to her house in south Monroe County near Uriah. They stayed there until Saturday, December 14, 1991. Paula Shiver then took the pair by automobile to the home of Cary and Mary Travis, the parents of Defendant TRAVIS, and dropped them off there at 6:30 p.m. Defendant TRAVIS stated to Paula Shiver that he wanted to see his parents and get his car. Defendant TRAVIS and HALL stayed there from 6:30 p.m. to approximately 7:05 p.m. and then walked away. The Travis home is one-half mile from the Clarene Haskew residence.
"Jessie Wiggins [a witness for the State] was home with her husband, and saw Defendant Travis and HALL at her house about 7:00 p.m., December 14, 1991. They asked to use the phone, dialed some numbers and left. She lived one-fourth of a mile from the Haskew home as the crow flies, one mile by road. On Sunday morning, December 15, 1991, she went to the Haskew home, saw the telephone wire cut, and the porch and kitchen doors smashed in. She called Medford Haskew, the son of Clarene Haskew.
"Nellie Shad [another witness for the State] lived approximately one-fourth of a mile from the Haskew residence. On December 14, 1991, she returned home at 10:30 p.m. and found her home had been burglarized. A .38 caliber Rossi revolver and a .410 [gauge shot] gun were taken from her home. That revolver was identified by its serial number in testimony by her ex-husband who had given it to her.
"On the morning of December 15, 1991, Conecuh County sheriff deputies and other investigators found the body of Clarene Haskew in her home. Mrs. Haskew was a sixty-nine year old widow in poor health. Her home had been burglarized. Items were thrown about in the home. The body of Mrs. Haskew was found in the kitchen. A pentagram had been spray-painted on a cabinet above her body, the words `thunder struck' spray painted in large letters on the floor beside her body. On top of her body was found a large metal hook and a set of keys. Missing from the home was silverware and an address book. Also missing was her gray 1982 Ford LTD. It was ordinarily parked outside her home. A Ford pickup parked in a shed next to the house was found with its steering column opened and wires pulled out. Two sets of keys were found in the yard.
"Dr. George Wanger, state pathologist, was called to the scene. Based upon his examination there, and a later autopsy, he determined that Mrs. Haskew had suffered two gunshot wounds to the back of the head; exit wounds were on her forehead. Two spent bullets were found near the victim's head on the floor. He also found that she had suffered a number of blunt force injuries and had been strangled by hand or with an object. Her hyoid bone was broken and there were bruises around her throat. On her right and left cheeks were pinpoint hemorrhages. These occurred during strangulation, while her heart was beating. The muscles on her neck were bruised, a yellow abrasion on her neck occurred after there was no blood flow. The other blunt force injuries included a rectangular abrasion in the mastoid area and a tear in the skin at the right ear. The victim had numerous bruises. Red bruises were on her right lower back, blue bruises were on her buttocks, and purple bruises were on her left forearm.

*830 "Dr. Wanger found that Mrs. Clarene Haskew died of blunt force injuries and two gunshot wounds to the head. The blunt force injuries could have been sufficient in themselves to cause death. The order of the injuries is not completely known. If the gunshot wounds were last, they would have been the cause of her death, but she could have died from the blunt force injuries if she had not been shot. The blunt force could have caused her asphyxiation after the gunshot wounds. The two gunshot wounds would have caused immediate unconsciousness and the victim probably could not have felt pain after them.
"The Defendant TRAVIS and HALL were seen early Sunday morning, December 15, 1991, at the residence of Paula Shiver in south Monroe County. They drove up in Mrs. Haskew's 1982 Ford LTD and hid it behind a camper between 4:00 a.m. and 5:00 a.m. that morning. Neither appeared out of the ordinary. Hall stayed in the house with Paula Shiver and went with her later that day to get her son. Travis stayed in the car most of the day. Defendant TRAVIS told Paula Shiver that the car was his sister-in-law's car. Defendant TRAVIS came into the house about 6:00 p.m. that night. Monroe County Sheriff, Tom Tate, came later that evening. Paula Shiver called out that the sheriff was there. Both Defendant Travis and Hall went out the back door into the woods.
"Dog Wardens from Fountain prison came there with beagles. They tracked the Defendant TRAVIS and HALL about one and one-half miles through the woods to a kudzu patch. They shouted to Defendant TRAVIS and HALL to `Lay `em down, lay `em down,' [and] one of the two suspects said `Lets get it on. [T]he dog wardens shot 9 or 10 times. Defendant TRAVIS and HALL were both wounded.
"Defendant TRAVIS was searched there. Found on him were the keys to Mrs. Haskew's car, five .38 caliber bullets and his driver's license. Mrs. Haskew's car was impounded and searched. In the glove compartment of the car was the .38 caliber Rossi revolver taken from the Shad residence. In the trunk of the car was a .410 [gauge shot] gun, a box of silverware belonging to the victim and an address book belonging to the victim.
"Two forensic firearms examiners, Dale Carter and Brent Wheeler, tested the revolver and then compared test bullets fired from that gun with the two recovered bullets. One recovered bullet was found by both examiners to have been fired from the .38 Rossi revolver found in the car."

I.

A.
The appellant alleges several assignments of error in his first issue. Each relates to appellant's contention that the trial court committed reversible error because, he says, it abused its discretion by impermissibly limiting the questions he propounded to prospective jurors during voir dire relating to their attitudes concerning the death penalty. The appellant further argues that the trial court, sua sponte, disallowed the majority of the defense's voir dire questions, allowing only those questions that pertained to the ability of the venirepersons to "follow the [applicable] law." The appellant contends that so limiting voir dire violated his due process rights guaranteed by United States and Alabama Constitutions. U.S. CONST. Amend. XIV, and Ala. Const. Art. I, § 6 1901. The appellant argues that the court's actions deprived him of his right to a fair and impartial jury guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Art. I, § 6 of the Alabama Constitution 1901.
In support of these contentions, the appellant relies principally on Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). In Morgan, the Supreme *831 Court held, in pertinent part, that during voir dire, the trial court is required, at the defendant's request, to inquire into the prospective jurors' views on capital punishment to identify unqualified jurors, and that jurors who maintain they are unalterably in favor of the death penalty in every case are unable to follow the law, and should therefore be disqualified. 504 U.S. at 729, 112 S.Ct. at 2229-30. See also, Smith v. State, 698 So.2d 189 (Ala.Cr. App.1996).
The appellant does not identify each assignment of error or state the nature of the trial court's mistake, although he does refer this Court to portions of the record in which he states such limitations of his voir dire occurred. As this is a death case, however, this Court is required by the plain error doctrine to search the record for error. Rule 45A, A.R.A.P.
"At the outset, we note that the trial court has discretion in conducting voir dire examination of the jury venire and a trial court's decision in exercising that discretion will not be overturned without a showing of abuse of that discretion. See Browning v. State, 549 So.2d 548 (Ala. Crim.App.1989)." Lane v. State, 644 So.2d 1318, 1322 (Ala.Cr.App.1994). See also, Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), aff'd., 632 So.2d 543 (Ala.1993), aff'd., 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
In Smith v. State, 598 So.2d 189 (Ala.Cr. App.1996), this Court addressed the need in a capital case for the trial court to adequately inquire into the attitudes of prospective jurors regarding the death penalty:
"[The appellant] first contends that the trial court committed reversible error because it abused its discretion in prohibiting him from properly propounding reverse-Witherspoon questions to the prospective venirepersons, i.e., questions inquiring into their `pro-death-penalty biases.' In support of his contention, the appellant relies principally on Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). While Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), dealt with venirepersons who were opposed to the death penalty, the instant case deals with the reverse situation; however, similar principles apply. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"The United States Supreme Court in Morgan v. Illinois held that veniremembers who would automatically vote for the death penalty for every eligible defendant must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirements of the Due Process Clause of the Fourteenth Amendment. The Court held that a capital defendant may challenge for cause any prospective juror who would automatically vote to impose death if the defendant was convicted of a capital offense; that on voir dire, the trial court is required, at the defendant's request, to inquire into the prospective jurors' views on capital punishment to identify unqualified jurors; and that jurors who are unalterably in favor of the death penalty in every case are unable to follow the law, and should therefore be disqualified. The Court warned that even if one such juror was empaneled and the death sentence imposed, the state would not be entitled to execute the sentence. Upon proper request, the veniremembers in a capital case should be questioned as to whether any veniremember has a fixed opinion in favor of capital punishment. Bracewell v. State, 506 So.2d 354 (Ala.Cr.App. 1986). `The better practice is that where the death penalty is a possibility, the trial judge should examine the prospective *832 jurors to ascertain whether any of them would clearly vote either for or against the death penalty regardless of the evidence.' Kuenzel v. State, 577 So.2d at 485.
". . . .
"The scope of the voir dire examination of veniremembers is left largely to the discretion of the trial court and will not be disturbed on appeal on the ground that voir dire examination was limited absent an abuse of that discretion. Nodd v. State, 549 So.2d 139 (Ala. Cr.App.1989). The right to question veniremembers regarding their qualifications to serve on the jury or their interest or bias is limited by propriety and pertinence and is to be exercised within the sound discretion of the trial court, and the questions must be reasonable under the circumstances of the case. McLeod v. State, 581 So.2d 1144 (Ala.Cr.App.1990).
"`The trial judge has considerable discretion in deciding what questions may be asked of the prospective jurors on voir dire. He must be free to exclude those questions which are "intended solely to accomplish such improper purpose" or which are not "phrased in neutral, non-argumentative form." He must also be able to "restrict the examination of jurors within reasonable bounds so as to expedite the trial." And he must on occasion be allowed to restrict questioning in order to give some protection to the privacy of prospective jurors.
"`It has been correctly noted that "appellate courts will only rarely reverse a trial judge's decision" not to permit certain questions on voir dire. Generally, courts are inclined not to reverse unless it seems likely that as a result of the limited voir dire the jury was prejudiced.'
"3 W. LaFave and J. Israel, Criminal Procedure 21.3 (1984) (citations omitted)."
Smith v. State, 698 So.2d at 198-99. (Footnotes omitted.)
In most of the instances cited by the appellant, the trial court appears to be attempting to clarify improper, leading or misleading questions propounded by the defense. The trial court was not attempting to unreasonably limit the scope of appellant's voir dire. Illustrative of the problem encountered by the trial court is the following exchange that took place among the court, the defense, and the prosecutor, and outside the hearing of any venirepersons, early in the voir dire process:
"THE COURT: I'm going to grant the challenge for cause, but, I'm going to make an observation. What you both are doing, you more than [Prosecutor's] doing, is you are not informing this jury of the process by which a capital verdict is rendered and you're just sort of misleading the jurors as to what their process will be. Now if you're going to ask questions like this I think you ought to ask them in terms of what the real world is going to be in terms of what the process is of weighing aggravating and mitigating circumstances
"[The prosecutor]: Your Honor, I did that.
"THE COURT:you want me to instruct them
"[The prosecutor]: Your Honor, I did that
"[Defense counsel]: Well, I'm not going to argue
"[The prosecutor]:and she answered that she would do that and wouldn't do it in every case. And I understand that you've ruled, but, I'd ask the court to reconsider. In response to questions by me in regard to correct statements of law she said that she would be fair
"[Defense counsel]: Excuse me.
"[The prosecutor]:to both sides.
"[Defense counsel]: If I could make an observation, the State doesn't ask those kinds of questions when they're trying *833 to Witherspoon someone and this is reverse-Witherspoon and we respectfully say and we'll try to be as short as we can with our questions, but, that we have the right to ask these questions in the manner in which they've been asked. But, we will take the court's admonitions into consideration. Thank you.
"[The prosecutor]: Your Honor, each case the State ask about, since we're going into that issue, deals with appropriate cases based on Alabama law. Mr. Elbrecht [co-counsel for the defense] talks about every murder case. The court's well aware that only certain types of murder cases deal with the death penalty and the predicates his questions lay on is an incorrect statement of law in Alabama.
"[Defense counsel]: Well, Judge, I think it's even stronger if a person will say to the court that I will fix a punishment of death automatically for the conviction of murder
"THE COURT: What you're doing is you are allowing the ignorance of the witnessof the juror as to the process in Alabama and you're leading the witness to a point where they do make that answer. And this lady was somewhat are you listening to me or listening to Mr. King [co-counsel for the defense]?
"[Defense counsel]: I'm listening to both of you, Judge. I'm sorry.
"THE COURT: This lady was somewhat ambivalent about the death penalty and I made a considered decision that the sum total of her opinion was one which allowed a defense challenge to be granted. But, I'm going to allow both sides to object to leading questions which are improper statements when it goes too far."
Thereafter, the following exchange took place:
"[The prosecutor]: We're going to object to the question in that form, Judge. It does not follow Alabama law. It's going to confuse the jurors.
"[Defense counsel]: I'm not attempting to confuse anyone. We would
"THE COURT: I'll sustain the objection.
"Q: [By the Defense]: [Potential Juror]
"A: Yes, sir.
"Q: if you were on this or any other jury and the jury found someone guilty of an intentional murder, intentionally murdering somebody, on purpose, do you have any opinions about the penalty or the punishment that person should receive?
"[The prosecutor]: I object to that question, Judge, and ask the juror not to answer the question until the court rules because that, once again, does not correctly state the law in Alabama and does not fully explain to the juror what his role would be in this case.
"[Defense counsel]: And if he has an objection, we would ask that he make it.
"THE COURT: I think he just did, Mr. Elbrecht. Objection sustained."
The appellant's first assignment of error concerns a prospective juror who was asked by defense counsel whether she had a fixed opinion about this case based upon what she had heard. The venireperson replied that she could not form an opinion "without having heard all the evidence." Defense counsel continued to press the issue and the prosecutor objected. In sustaining the State's objection, the trial court admonished defense counsel, stating, "I think you're going beyond the bounds."
The appellant appears to allege that the trial court attempted to control his reverse-Witherspoon voir dire examination. Although the judge did require the appellant to rephrase his question, he in no way limited appellant's inquiry as to the individual's attitude regarding the death penalty. Moreover, following the defense's voir dire of the veniremember defense was examining at the time of the alleged limiting *834 behavior by the trial court, the trial court excused the veniremember for cause.
In another instance cited by the appellant as an improper limitation by the trial court of voir dire examination, defense counsel appeared to be inquiring whether the venireperson thought the death penalty was appropriate in cases involving what was simply intentional murder, rather than capital murder. In that instance, the court interrupted defense counsel to clarify counsel's misstatement. Further, the court once again granted the appellant a challenge for cause as to that prospective juror.
Although an accused clearly has the right to ask potential jurors their attitudes respecting the death penalty, the accused does not have the right to improperly elicit this information from the prospective jurors, or to interject error into the record of this case.
This Court has carefully examined the record in its entirety, and we can find no "`inadequacy of voir dire'" as would cause this Court to doubt that appellant was sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment. Morgan v. Illinois, 504 U.S. 719, 739, 112 S.Ct. 2222, 2235, 119 L.Ed.2d 492. Indeed, voir dire in this case encompassed six and one-half volumes of transcript, or 1,456 pages, and the only questions that the trial court excluded or required to be rephrased were "those questions which are `intended solely to accomplish [an] improper purpose' or which are not `phrased in neutral, non-argumentative form.'" 3 W. LaFave and J. Israel, Criminal Procedure 21.3 (1984) (citations omitted). Smith v. State, 698 So.2d at 198-99. The exclusion of such questions is not error.

B.
The appellant also contends that the trial court abused its discretion by so limiting the extent of his voir dire that it rendered his statutory right of peremptory challenge, particularly regarding the venire's attitudes toward capital punishment, "totally arbitrary and meaningless." He cites Nodd v. State, 549 So.2d 139, 145 (Ala.Cr.App.1989), in support of this proposition.
In Nodd v. State, the trial court conducted virtually all of the voir dire, and refused to ask the venire a number of questions specifically requested by the defense, which inquired whether the prospective jurors would tend to believe the testimony of a police officer over the testimony of a layman simply because the witness was a police officer. The facts of Nodd v. State involved the possession of a controlled substance, and almost all of the evidence offered by the State came from police officers. In holding that the trial court abused its discretion in refusing to inquire as to whether any member of the venire might be more or less inclined to credit the testimony of a police officer simply because of his or her official status, the Nodd Court stated, in pertinent part, as follows:
"The peremptory challenge has been recognized as `essential to the fairness of trial by jury,' Lewis v. United States, 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892), and `one of the most important of the rights secured to the accused.' Pointer v. United States, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). See also Batson v. Kentucky, 476 U.S. 79, 120-22, 106 S.Ct. 1712, 1736, 90 L.Ed.2d 69 (1986) (Burger, C.J., dissenting); Batson, 476 U.S. at 105-07, 106 S.Ct. at 1728 (Marshall, J., concurring). Even the majority in Batson recognized that `the peremptory challenge occupies an important position in our trial procedures.' Batson, 476 U.S. at 98-99, 106 S.Ct. at 1724. See also Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965); Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (`[A] capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of *835 racial bias.'). Inadequate voir dire diminishes the statutory right of peremptory challenge, Ala.Code 1975, XX-XX-XXX, and may even render the right totally arbitrary and meaningless.
"`Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. See Connors v. United States, 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033 (1895). Similarly, lack of adequate voir dire impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts.'

"Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981)."
549 So.2d at 145.
A trial court is vested with great discretion in determining how voir dire examination will be conducted, and the court's decision as to the extent of voir dire examination required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
Even in reversing the trial court, this Court in Nodd v. State reaffirmed the long-standing principle that the scope of voir dire is a matter within the sound discretion of the trial judge:
"In finding in this case that the trial judge abused his discretion in refusing to inquire or allow any inquiry on this matter, we do not retreat from our holdings in other cases where we found no abuse of discretion in refusing to make this or similar inquiries. Roberson v. State, 384 So.2d 864, 868 (Ala.Cr.App.), cert. denied, 384 So.2d 868 (Ala.1980) (child); Radford v. State, 348 So.2d 880, 884-85 (Ala.Cr.App.1977) (relatives); Powell v. State, 53 Ala.App. 30, 35-36, 297 So.2d 163 (1974) (police officer). Each instance of the alleged abuse of discretion must be judged upon its own particular merits in the context of the specific facts and circumstances of each individual case. On appeal, this Court will indulge every presumption that the trial court ruled correctly, Ballard v. State, 236 Ala. 541, 542, 184 So. 260 (1938), and will reverse only where there has been a clear abuse of discretion. Pace v. State, 284 Ala. 585, 586, 226 So.2d 645 (1969)."
549 So.2d at 147 (Emphasis in original). The trial court in this case allowed the defense extensive voir dire, disallowing only those questions that were misleading or argumentative.

II.
The appellant next argues that his indictment is fatally defective, because, he says, it fails to allege that the murder occurred during a burglary in the first degree.
The appellant's indictment reads as follows:
"WAYNE HOLLEMAN TRAVIS, whose name is otherwise unknown to the Grand Jury, did knowingly and unlawfully enter or remain unlawfully in a dwelling of Clarene Haskew with intent to commit crime therein, to-wit: Theft of property, and while effecting entry or while in the dwelling or in immediate flight therefrom, said Defendant, Wayne Holleman Travis, or another participant, Steven Wayne Hall, Jr., was armed with an explosive or deadly weapon, to-wit: a pistol, and did intentionally cause the death of Clarene Haskew by shooting her with a pistol, in violation of § 13A-5-40(a)(4) of the Code of Alabama."
*836 The appellant argues that while this indictment alleges the statutory elements of burglary in the first degree and the statutory elements of intentional murder, "the indictment fails to allege that the intentional murder occurred during the burglary in the first degree."
"An indictment is sufficient if it substantially follows the language of the statute violated, provided the statute prescribes with definitiveness the elements of the offense. Ex parte Allred, 393 So.2d 1030 (Ala.1980). An indictment must allege all the elements of the offense charged and must also sufficiently apprise the accused of what he or she must be prepared to defend against. Hewlett v. State, 520 So.2d 200 (Ala.Cr.App. 1987), cert. denied, 520 So.2d 200 (Ala. Cr.App.1988)."
Breckenridge v. State, 628 So.2d 1012, 1015-16 (Ala.Cr.App.1993).
"... `If the indictment is framed under a statute which defines the offense created, and prescribes its constituents, it must allege in the words of the statute, or other words equivalent in meaning, all the statutory elements which are essentially descriptive of the offense.' Barbee v. State, 417 So.2d 611, 612-13 (Ala.Cr.App.1982) (quoting Holt v. State, 86 Ala. 599, 600, 5 So. 793 (1889), and quoted in Tinsley v. State, 485 So.2d [1249] at 1251 [Ala.Crim.App.1986]). `The rule is that "the indictment must contain all the essentials to constitute the offense, explicitly charged, and that they must not be left to inference."' 417 So.2d at 613 (quoting State v. Seay, 3 Stew. 123, 131 (Ala.1830))."
Heidelberg v. State, 575 So.2d 621, 622 (Ala.Cr.App.1991).
The word "while," which is the descriptive term contained in the indictment, is synonymous with "during," and is sufficiently "equivalent in meaning" to that statutory element. Heidelberg v. State, supra.

III.
The appellant next contends that the trial court erred to reversal by denying his motion to dismiss the indictment and his challenge to the composition of the grand and petit juries. Specifically, the appellant alleges that the jury selection process employed in Conecuh County violated the fair cross-section requirement of the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
At the hearing on appellant's motions, it was established that Conecuh County jurors were selected at random by use of a computer located at the Administrative Office of Courts. The data used to select the prospective jurors came from a list of licensed drivers in Conecuh County, and included people who, although they did not possess a driver's license, had identification cards and who were over 19 years of age. "`Random selection from a list of licensed drivers has been held to be an acceptable manner in which to select a jury. See Stewart v. State, 623 So.2d 413, 415 (Ala.Cr.App.1993); Joyce v. State, 605 So.2d 1243, 1245 (Ala.Cr.App.1992).' Sistrunk v. State, 630 So.2d 147, 149 (Ala.Cr. App.1993)." Stanton v. State, 648 So.2d 638, 641 (Ala.Cr.App.1994).
The venire list, from which the grand jury that indicted the appellant was drawn, was prepared on August 5, 1991, and consisted of 186 persons, of whom 30.65% were black, 0.54% were of another race or Hispanic (one was Indian), and the remaining 68.81% were white. As to gender, 44.62% were female. Census evidence offered by the appellant indicated that the composition of the adult population of Conecuh County in 1990 was 37.64% black, 0.92% of another race or Hispanic, with whites comprising the remaining 61.44% of the population. The venire list from which the appellant's petit jury was chosen was apparently prepared on June 23, 1992. It was comprised of 33.69% black, 0.54% other races or Hispanic, and 65.77% white.
*837 In Ex parte Land, 678 So.2d 224 (Ala. 1996), the Alabama Supreme Court set out the burden of proof necessary to raise a "fair cross-section" argument:
"Although the State concedes that African-Americans constitute a distinctive group for equal protection purposes, it argues that, even assuming Land's census calculations are correct, he failed to establish that there had been a systematic exclusion of African-Americans from the venire. Citing Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the State argues that Land has failed to establish all the elements needed to prove a violation of the constitutional requirement that a jury be taken from a fair cross-section of the community.
"In Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the United States Supreme Court held that the systematic exclusion of women from the jury selection process deprived the defendant of his rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution to have his jury selected from a fair cross-section of the community. Then in Duren, supra, the Court stated:
"`In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.'
"Duren v. Missouri, 439 U.S. at 364, 99 S.Ct. at 668. See Ex parte Dobyne, 672 So.2d 1354 (Ala.1995). In Duren, the Supreme Court held that the defendant had met the third prong of the test, the most difficult one: `His undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of a year manifestly indicates that the cause of the underrepresentation was systematic that is, inherent in the particular jury selection process utilized.' Duren v. Missouri, 439 U.S. at 366, 99 S.Ct. at 669. Land, however, has offered no evidence toward meeting the third prong of the test established in Duren. Thus, we conclude that Land's argument on this issue is without merit."
Ex parte Land, 678 So.2d at 244.
Moreover, in Stanton v. State, 648 So.2d 638 (Ala.Cr.App.1994), this Court specifically approved the jury selection method employed by Conecuh County. Although the way in which the fair cross-section claim came before this Court in Stanton was procedurally different than it is in the present case, the issue decided was the same: whether the jury selection system used in Conecuh County consistently resulted in the underrepresentation of blacks on jury venires. In rejecting the appellant's claim, this Court stated, in pertinent part, as follows:
"In denying the motion for a continuance, the trial court took judicial notice that prospective jurors in Conecuh County are `randomly select[ed]' by computer from those Conecuh County residents `holding driver's license[s] and identity cards.' R. 97-98. Although noting that blacks constitute `about 37, 38% of the [jury] eligible population in Conecuh County,' and that `[t]his jury panel, as it ends up on the strike list after challenges for cause, is composed of 20% black and 80% white,' the court specifically found `nothing wrong with the selection procedure.' R. 98-99. This finding was correct. `Random selection from a list of licensed drivers has been held to be an acceptable manner in which to select a jury. See Stewart v. State, 623 So.2d 413[, 415] (Ala.Cr.App. 1993); Joyce v. State, 605 So.2d 1243, 1245 (Ala.Cr.App.1992).' Sistrunk v. *838 State, 630 So.2d 147, 149 (Ala.Cr.App. 1993).
". . . .
"`The third Duren [v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) ] elementthat there has been a systematic exclusion of a distinctive groupconstrains a defendant to establish that "the cause of the underrepresentation was ... inherent in the particular jury-selection process utilized." Duren, 439 U.S. at 366, 99 S.Ct. at 669.' Sistrunk v. State, 630 So.2d at 149. Additionally, `with regard to the second and third Duren elements, a defendant asserting a fair cross-section violation "must demonstrate ... not only that [blacks] were not adequately represented on his jury venire, but also that this was the general practice in other venires." Timmel v. Phillips, 799 F.2d 1083, 1086 (5th Cir.1986).' Sistrunk v. State, 630 So.2d at 150. In this case, there was absolutely no showing either that random computerized selection of licensed drivers inherently results in underrepresentation of blacks on jury venires in Conecuh County or that blacks had been underrepresented on other venires in Conecuh County."
Stanton, 648 So.2d at 640-41.
The appellant has clearly failed not only to prove that the representation of blacks on Conecuh County jury venires is not fair and reasonable in relation to the number of blacks in the community, but also to make any showing that any underrepresentation was due to the systematic exclusion of blacks in the Conecuh County jury selection process. Stanton, 648 So.2d at 640.
Moreover, it is the source from which the venire is selected that must be fairly representative of the community, rather than the jury actually chosen. "`The United States Constitution does not require an exact proportion between the percentage of blacks in the population and those on the jury list. What is required is that no qualified person can be excluded from jury service.' Jackson v. State, 549 So.2d 616, 619 (Ala.Crim.App.1989)." Pierce v. State, 576 So.2d 236, 242-43 (Ala. Cr.App.1990), cert. denied, 576 So.2d 258 (Ala.1991). See also, Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).

IV.
The appellant next contends that the trial court erred to reversal by denying his motion for a change of venue due to pretrial publicity. He contends that the victim, Clarene Haskew, "was a very beloved lady in Conecuh County, who had taught school for 25 years"; that the area in which the trial would occur "is a small, close-knit community"; and that it would therefore be impossible for him to receive a fair trial in Conecuh County. As an example of the pervasiveness of the publicity in this case, the appellant states that, of the 12 persons selected as jurors in his case, 7 of the 9 who were questioned on this issue had either read about the case in the newspaper or had heard about it in the community. The appellant therefore argues that the trial court erred to reversal in denying his motion for a change of venue.
In Smith v. State, 646 So.2d 704 (Ala.Cr. App.1994), which was not a capital case, the defendant shot and killed a well-known businessman, and attempted to murder two other men. Before trial, the appellant filed a motion for a change of venue, and the evidence adduced during that hearing established that the defendant's case had been heavily covered by both the broadcast and the print media, and was doubtlessly the source of much discussion throughout the community. Indeed, during voir dire examination, when the trial judge asked whether anyone had heard about this case from any source, every member of the venire stood. The defendant challenged 25 veniremembers for cause, and 19 of these challenges were granted. Each of the remaining venire-members *839 said that they could be fair and impartial, and could render a fair verdict based upon the evidence. The trial court denied the defendant's motion and the defendant challenged that court's denial on direct appeal. This Court affirmed the judgment of the trial court, holding, in pertinent part, as follows:
"Although the appellant established the existence of substantial pretrial publicity, there was no showing that the publicity prejudiced the venire against the appellant. `It is well established in Alabama ... that the existence of pretrial publicity, even if extensive, does not in and of itself constitute a ground for changing venue and thereby divesting the trial court of jurisdiction of an offense.' Ex parte Fowler, 574 So.2d 745, 747 (Ala.1990).
"`The defendant has failed to satisfy the test set out in Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), because he has not proved that "there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity." "Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue." Id. "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved." Id. "The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).
"`"To ensure that the defendant has a fair and impartial jury, it is not necessary that the veniremembers be totally ignorant of the facts surrounding the case. Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). `It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)."
"`Ex parte Whisenhant, 555 So.2d 235, 238 (Ala.1989).'
"Kuenzel v. State, 577 So.2d 474, 483-84 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
". . . .
"Our review convinces this Court that the trial judge did not abuse his discretion in denying the motion for a change of venue.
"`"The trial court's findings of impartiality should be overturned only for `manifest error.' Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)." Fortenberry v. State, [545 So.2d 129 (Ala.Cr.App. 1988), affirmed, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990)]. "Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983)." Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). We find no abuse of discretion by the trial court or manifest error in his finding of impartiality.'
"Oryang v. State, 642 So.2d (Ala.Cr.App. 1993) (every member of venire indicated that they had been exposed to pretrial publicity). See also Thomas v. State, 539 So.2d 375, 394 (Ala.Cr.App.) (`[a]t the beginning of voir dire, every member of the venire stated he or she had read or heard about this case'), affirmed, 539 So.2d 399 (Ala.1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). Here, as in Thomas, *840 539 So.2d at 395, the appellant has `failed to show a connection between the pre-trial publicity and the existence of actual jury prejudice.'
Smith v. State, 646 So.2d at 706-07.
In Owens v. State, 531 So.2d 2 (Ala.Cr. App.1986), rev'd on other grounds, 531 So.2d 22 (Ala.Cr.App.1987), this Court stated:
"`An accused is entitled to a change of venue if he can affirmatively demonstrate to the trial court that the pre-trial publicity has so saturated the community as to have a probable impact on the prospective jurors or that there is a connection between the publicity generated and the existence of actual jury prejudice.... Except in the situation where there has been a showing of inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, the trial court's primary responsibility in dealing with allegedly prejudicial pre-trial publicity is whether, as a result of such publicity, it is reasonably unlikely that the defendant can secure a fair and impartial trial.'
"The burden is on appellant to demonstrate that the `"trial atmosphere [was] utterly corrupted by press coverage,"' Dobbert v. Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977) (quoting Murphy v. Florida, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975)), or that there is a connection between the publicity generated by the media and the existence of actual jury prejudice, Anderson v. State, 362 So.2d 1296, 1300 (Ala.Crim.App.1978)."
Owens v. State, 531 So.2d at 9. See also Williams v. State 710 So.2d 1276 (Ala.Cr. App.1996).
Moreover, the record indicates that more than a year passed between the murder and the appellant's trial, and that the most intense media coverage of this case occurred immediately after Mrs. Haskew's murder. "The passage of time between the publicity concerning the crime and the trial of the defendant `"cannot be ignored as a factor in bringing objectivity to the trial."` Robinson v. State, 430 So.2d 883, 886 (Ala.Crim.App.1983) (quoting Dannelly v. State, 47 Ala.App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971)); Langham v. State, 494 So.2d 910 (Ala.Crim.App.1986)." Pilot v. State, 607 So.2d 306, 308 (Ala.Cr.App.1992), aff'd, 607 So.2d 311 (Ala.1992).

V.
Relying on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Ex parte Branch, 526 So.2d 609 (Ala.1987), and their progeny, the appellant argues that the prosecution engaged in purposeful racial discrimination in removing blacks from his trial jury. The appellant argues, therefore, that he is entitled to a new trial.
The record shows that the appellant's jury venire included 36 members, 20 of whom were black. The State used 11 of its 12 strikes to remove blacks from the jury. The appellant's jury included 9 blacks and 3 whites. Two alternate jurors were selected, one of whom was white and the other black. The appellant made a timely Batson motion, and the trial court found that he had established a prima facie case of racial discrimination, and required the prosecution to justify its strikes. The prosecution then proceeded to give reasons for its strikes, and the trial court held that the reasons were all sufficiently race-neutral.
This Court has held consistently that the trial court is in the best position to determine whether the prosecution's reasons for its strikes are adequate. Grider v. State, 600 So.2d 401, 403 (Ala.Cr. App.1992) (and cases cited therein). The standard of review of the trial court's determination is high, and an appellate court may reverse the trial court's findings that the State's strikes were not motivated by intentional discrimination only if the trial court's findings are "clearly erroneous." *841 Gaston v. State, 581 So.2d 548, 549 (Ala.Cr. App.1991); Grider, supra.
This Court notes that the appellant's jury was 75% black. The appellant's jury venire was approximately 56% black, and blacks comprised, at most, about 38% of the population of Conecuh County. As the Alabama Supreme Court noted in Ex parte McNair, 653 So.2d 353, 356 (Ala. 1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), while these facts alone are not determinative of a Batson issue, "they do negate a finding of a disparate impact and they weigh heavily against a finding of discriminatory intent on the part of the prosecutor."
Further, in United States v. Forbes, 816 F.2d 1006 (5th Cir.1987), a decision this Court cited in Carrington v. State, 608 So.2d 447, 448-49 (Ala.Cr.App. 1992), the Court held that, where the black/white ratio on the jury is at least the same as that on the jury venire, no prima facie showing of purposeful discrimination has been made. Id. See also, Ex parte Bird, 594 So.2d 676, 680 (Ala.1991) (where a greater percentage of blacks are seated on the jury than were in the jury venire, less support for a prima facie case of purposeful discrimination exists.) However, we recognize that, where as here, the trial court required the State to come forward with reasons for its strikes, this Court is required to determine that those reasons are race-neutral, even if no prima facie case of discrimination has been shown.
Of the 11 blacks struck by the State, 10 expressed opposition to the death penalty. "[I]t is well-settled that opposition to the death penalty is a race-neutral reason. Jackson v. State, 640 So.2d 1025, 1037 (Ala.Cr.App.1992); Carroll v. State, 599 So.2d 1253, 1258 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994); McGahee v. State, 554 So.2d 454, 461 (Ala.Cr.App.), aff'd, 554 So.2d 473 (Ala.1989)." Wood v. State, 715 So.2d 812 (Ala.Cr.App.1996). We further note that the State also struck a white veniremember, in part because he expressed ambivalence about the death penalty. The fact that the prosecutor's strike against a white veniremember was based on the same reason as that for striking the black veniremember indicates that the reason was properly race-neutral. See, Lyde v. State, 605 So.2d 1255, 1256-57 (Ala.Cr. App.1992); Harris v. State, 545 So.2d 146 (Ala.Cr.App.1988).
The last veniremember struck by the State, who is black and who served as an alternate juror, was struck because she knew the district attorney and because the State had prosecuted her husband for theft and forgery. "The fact that a prospective juror's relative had been a criminal defendant can be a sufficiently race-neutral reason for striking that member from the venire. See Powell v. State, 548 So.2d 590 (Ala.Cr.App.1988), aff'd, 548 So.2d 605 (Ala.1989)." Knight v. State, 621 So.2d 394, 395 (Ala.Cr.App.1993).
In the present case, there is no indication that the prosecutor's exercise of his peremptory challenges was racially motivated, and the trial court's decision on this matter is not clearly erroneous. Accordingly, appellant's argument must fail.

VI.

A.
The appellant argues that the trial court's jury instruction on reasonable doubt violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution, because he says use of the terms "moral certainty" and "reasonable substantial doubt" to define reasonable doubt were held to violate the Due Process Clause in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The appellant therefore alleges that the jury could have found him guilty based on a lesser degree of proof than that required by due process under state and federal law.
*842 The State contends in its brief to this Court that the appellant failed to raise this claim until the jury had retired, and that his objection was therefore not timely. The State contends that the plain error rule applies to the appellant's claim. Rule 45A, Ala.R.App.P. However, the record indicates that, after the jury was recessed to select a foreperson, but before it began any deliberations, the appellant objected as follows:
"We'd object to the Court's reasonable doubt instruction under [Cage] v. Louisiana."
Thus, the appellant's objection appears to have been timely made. See Rule 21.2, Ala.R.Crim.P., which requires a party to object "before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection." Nevertheless, the record indicates that the trial court did not rule on the appellant's objections to its oral charge; therefore, because the appellant failed to receive an adverse ruling to his objection, this Court must review this claim applying the plain error standard. Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995), aff'd, 710 So.2d 1276 (Ala.Cr.App.1996); Guthrie v. State, 616 So.2d 914 (Ala.Cr.App.1993).
Although the failure to object does not preclude review in a capital case, it weighs against any claim of prejudice. Kuenzel v. State, 577 So.2d 474, 520 (Ala. Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
"The Due Process Clause of the Fourteenth Amendment `protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072-73, 25 L.Ed.2d 368 (1970)." Williams v. State 710 So.2d 1276 (Ala.Cr.App.1996).
In Cage v. Louisiana, supra, the United States Supreme Court noted that the trial court's jury instruction defined reasonable doubt using terms such as a "grave uncertainty," an "actual substantial doubt," and a "moral certainty." It further noted that the words "substantial" and "grave," as they were commonly used and understood, "suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard." Mack v. State, 607 So.2d 314, 316 (Ala.Cr.App.1992).
However, in Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the Court overruled the holding in Cage v. Louisiana, stating that when reviewing ambiguous jury instructions, an appellate court must determine "`whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." 502 U.S. at 72, 112 S.Ct. at 482 quoting Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990)." "Thus, the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994); Ex parte Kirby, 643 So.2d 587 (Ala.), cert. denied, 513 U.S. 1023, 115 S.Ct. 591, 130 L.Ed.2d 504 (1994); Cox v. State, 660 So.2d 233 (Ala.Cr.App.1994)." Knotts v. State, 686 So.2d 431, 459 (Ala.Cr. App.1995). In a footnote, the Estelle Court explained:
"In Boyde ... we made it a point to settle on a single standard of review for jury instructionsthe `reasonable likelihood' standardafter considering the many different phrasings that had previously been used by this Court. 494 U.S., at 379-380 [110 S.Ct. at 1197-1198] (considering and rejecting standards that required examination of either what a reasonable juror `could' have done or `would' have done). So that we may once again speak with one voice on this *843 issue, we now disapprove the standard of review language in Cage and Yates [v. Evatt, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991)], and reaffirm the standard set out in Boyde."
502 U.S. at 73 n. 4, 112 S.Ct. at 482 n. 4.
In Victor v. Nebraska, supra, the Supreme Court addressed two separate reasonable doubt charges and found in each instance that the trial court's instructions a as whole adequately conveyed the concept of reasonable doubt. The Victor Court defended the use of the word "substantial," a word it criticized in Cage as elevating the degree of doubt a jury needed to acquit, holding that in the present case that "substantial" was used in the sense of existence, rather than magnitude of the doubt. The Victor Court explained that:
"`[T]he moral certainty language cannot be sequestered from its surroundings. In the Cage [v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990)] instruction, the jurors were simply told that they had to be morally certain of the defendant's guilt; there was nothing else in the instruction to lend meaning to the phrase. Not so here. The jury... was told that a reasonable doubt is `that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.' The instruction thus explicitly told the jurors that their conclusion had to be based on the evidence in the case."
Victor v. Nebraska, 511 U.S. at 16, 114 S.Ct. at 1239. See also Inmin v. State, 654 So.2d 86, 89-90 (Ala.Cr.App.1994). "[T]aken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury." Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150 (1954).
The trial court's reasonable doubt instruction during the guilt phase of appellant's trial was as follows:
"Ladies and gentlemen, you've heard me use the word `reasonable doubt' on several occasions during this charge. You've heard it throughout the course of this trial. I'll now define for you reasonable doubt.
"A reasonable doubt must be a substantial doubt. It's not merely a guess or a surmise. It's the type of doubt based upon reason and logic. It is not based upon speculation. The reasonable doubt which entitles an accused to an acquittal is not merely a fanciful, vague, conjectural or speculative doubt, but, is a reasonably substantial doubt arising from the evidence or from a part of the evidence or from a lack of the evidence. A reasonable doubt is not dissipated after careful consideration of the testimony such as reasonable, fairminded and conscientious people would entertain under all the circumstances.
"The State is not required to convince you of the Defendant's guilt beyond all doubt nor to a mathematical certainty nor beyond a shadow of doubt. None of those standards is the correct standard. The State is only required to convince you beyond a reasonable doubt as I have defined that term to you.
"Another way to put it is a reasonable doubt is a doubt that you can assign a reason for or a reason to. If, after comparing and considering all the evidence in the case, you have an abiding conviction of the truth of the charge, then, you are convinced beyond a reasonable doubt and it would be your duty to convict the Defendant. On the other hand, if, after comparing and considering all the evidence in this case, your minds are left in such condition that you cannot say you have an abiding conviction to a moral certainty of the Defendant's guilt, then, you are not convinced beyond a reasonable doubt and the Defendant would be entitled to an acquittal."
In construing the instructions in this case, this Court must consider how reasonable *844 jurors could have understood this charge as a whole. Ex parte McWilliams, 640 So.2d 1015, 1024 (Ala.1993). The inclusion of the phrase "moral certainty," by itself, did not render the instruction in this case unconstitutional when the inclusion of the phrase is reviewed in the context of the entire charge.

B.
The appellant also alleges that the court's use of the terms "substantial doubt" and "moral certainty" in its definition of reasonable doubt, its references to "a moral certainty" in its instruction regarding circumstantial evidence, its use of the phrase "moral certainty" in its instruction regarding aggravating factors, and its alleged use of "moral certainty" as the equivalent of reasonable doubt throughout the instructions during the penalty phase make it probable that its instructions could have allowed the jury to impose the death penalty based upon proof below the "beyond a reasonable doubt" requirement of the Due Process Clause.
The Court's reasonable doubt charge during the penalty phase of appellant's trial stated, in pertinent part, as follows:
"THE COURT: The Defendant is presumed, as a matter of evidence, to be innocent. When all or part of the evidence relied upon by the prosecution is circumstantial, the chain of circumstances must be so complete and of such character as to convince you beyond all reasonable doubt and to a moral certainty, that the Defendant is guilty. The evidence must be so strong and cogent, and unless it is strong and cogent as to show the Defendant's guilt to a moral certainty, you should find the Defendant not guilty.
"A conviction may be had upon evidence which is partially or fully circumstantial so long as the evidence is so strong and cogent as to prove the guilt of the accused to a moral certainty and beyond a reasonable doubt. If circumstantial evidence permits an inference consistent with innocence, it will not support a conviction."
The reasonable doubt instruction given during the penalty phase was very similar, if not identical, to that given during the guilt phase. As the reasonable doubt instruction used in the guilt phase of appellant's trial satisfied the requirements of Estelle v. McGuire, supra, and Victor v. Nebraska, supra, this Court finds no merit in appellant's argument. See Part VI. A. of this opinion. Moreover, the appellant used the phrase "beyond a reasonable doubt and to a moral certainty" in both his opening and closing arguments, a fact that tends to weigh against a finding of prejudice. DeBruce v. State, 651 So.2d 599, 617 (Ala.Cr.App.1993), aff'd, 651 So.2d 624 (Ala.1994).

VII.
The appellant argues that the trial court failed to properly instruct the jury on the issues relating to intent to kill and complicity, in that it failed to instruct the jury that the appellant had a "particularized intent to kill." He further argues that the instruction on complicity was confusing and could lead the jury to believe that it could convict him of capital murder if it merely found that he was an accomplice to only the burglary.
Although the appellant stated his objections to the trial court's instructions on particularized intent in a timely manner, the record indicates that the court never ruled on these objections. Because the appellant never received an adverse ruling on his objections to the court's oral charge, we must also review this issue applying the plain error standard. Guthrie v. State, 616 So.2d 914 (Ala.Cr.App. 1993).
In Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), this Court set out some of the general principles followed by Alabama appellate courts in the construction or interpretation of the trial court's oral charge:

*845 "The proposition is well established that `a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge'...'[W]here a portion of the court's oral charge is erroneous, the whole charge may be looked to, and the entire ... charge must be construed together to see if there was reversible error'..."
577 So.2d at 517. (Citations omitted). The Kuenzel Court observed that "isolated statements which appear prejudicial when taken out of context may be innocuous when viewed in light of the entire trial." Id., citing United States v. McCoy, 539 F.2d 1050, 1063 (5th Cir.1976), cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977). Moreover, the language used in a charge must be given a reasonable construction, not one that is unreasonable or strained. Id.
In Sockwell v. State, 675 So.2d 4 (Ala.Cr. App.1993), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996), this Court addressed the argument now being raised by the appellant:
"The instructions in this case do not contain the same flaw as the instructions in Russaw v. State, 572 So.2d 1288 (Ala. Crim.App.1990), as the appellant argues. In Russaw, the trial court failed to instruct the jury that in the capital offense for robbery-murder, it had to find that the defendant had a particularized intent to kill. Id. at 1289. The trial court in this case plainly charged the jury that it had to find a `real and specific' intent on the part of the appellant in order to invoke the capital statute.
"Additionally, we do not find the instructions of the trial court confusing in regard to the doctrine of accomplice liability as we did in Russaw. The trial court properly charged the jury on what it would have to find as to the appellant's intent if it determined that he did not actually shoot the victim."
Sockwell, 675 So.2d at 24.
In this case, the jury was properly charged as to the "particularized intent to kill," and as to complicity. The trial court clearly explained first, that to find capital murder the jury had to be convinced beyond a reasonable doubt that the appellant committed the crime of burglary in the first degree, as it had previously been defined. The court then instructed the jury that it had to be convinced beyond a reasonable doubt that the appellant "committed a murder of the intentional killing type" during a burglary in the first degree. It then explained in detail the definition of the crime of murder of the intentional killing type, and the elements that the jury had to find for such a murder to exist. Finally, the trial court instructed the jury that the fact that someone dies, or is killed, in the course of a robbery does not automatically provide intent to kill.
The trial court also clearly explained the concept of "complicity" to the jury. The court indicated that the jury could not find the appellant guilty of capital murder under a complicity theory unless it found beyond a reasonable doubt that the appellant intentionally procured, induced, or caused another person to commit the murder, or that he intentionally aided or abetted another person's commission of the murder.
When viewing this instruction in the context of the overall charge, a juror would not convict the appellant of capital murder if the juror merely found him to be an accomplice to a burglary.
Therefore, there is no merit to appellant's claim.

VIII.
The appellant argues that the trial court erred by denying his motion for new trial alleging newly discovered evidence.
Appellant's "newly discovered" evidence was an alleged confession by his codefendant, Steven Wayne Hall, mailed to the appellant's adoptive father on or about September 8, 1993. Hall testified at the *846 hearing on the appellant's motion for new trial; the letter was made part of the record, but was not admitted into evidence.
Hall's testimony was that, on December 14, 1991, after walking away from the appellant's house and stopping at another house to use the telephone, he and the appellant continued to walk down the road until they reached an abandoned house. They entered this house and took a nap, but Hall awoke before the appellant and left the appellant asleep in the old house. Hall then committed the crime spree for which the appellant has been held, in part, responsible, then returned to the abandoned house, to find appellant still asleep.
However, on cross-examination, Hall admitted to giving a statement to Investigator Benson, of the Alabama Bureau of Investigation, in which he said that both he and the appellant broke into the first house; he also admitted to his psychiatrist that both he and the appellant had committed the murder. Hall also admitted that the version of the alleged facts stated in the letter came as a total surprise to his attorney. Moreover, in rebuttal to Hall's testimony, the State called Investigator Benson, who had taken an audiotaped statement from the appellant on December 26, 1991. This tape was played before the court; it directly contradicted the testimony given by Hall at the hearing.
Hall's testimony was not so much "newly discovered," as it was "newly disclosed." The appellant knew either that he did or did not commit the murder for which he had been convicted, and he also knew whether he had been present at the scene of this crime. He never raised this claim previously. As this Court held in Doty v. State, 647 So.2d 41, 43 (Ala.Cr.App.1994):
"The fact that the appellant regained his memory of the specific events surrounding the homicide only after his guilty plea had been accepted does not qualify as `newly discovered evidence.' In Lewis v. State, 367 So.2d 542, 546 (Ala.Cr.App.1978), cert. denied, 367 So.2d 547 (Ala.1979), this Court stated:
"`The fact that appellant could not remember the last name of a potential witness was not the fault of the prosecution nor of appellant's attorney. When appellant did remember the name of witness DeBardeleben, this was not newly discovered evidence, but rather newly disclosed evidence. A petition for writ of error coram nobis is not intended to relieve a party of his own negligence. Thornburg v. State, 42 Ala.App. 70, 152 So.2d 442 (1963).' (Emphasis in original.)
"This Court reached a similar conclusion in Watkins v. State, 601 So.2d 187, 190 (Ala.Cr.App.1992):
"`The appellant states that after the trial he recalled the name of an alibi witness and sought a new trial. He now argues that her testimony was newly discovered alibi evidence.
"`This is not newly discovered evidence, but, rather, newly disclosed evidence; a new trial is not warranted. Lewis v. State, 367 So.2d 542 (Ala.Cr. App.1978), writ denied, 367 So.2d 547 (Ala.1979); 66 C.J.S. New Trial 101 (1950). The circuit court did not err in denying the motion.'"
Moreover, even if the appellant's evidence had been "newly discovered" and not simply "newly disclosed" evidence, it would not have entitled him to a new trial. In Gillespie v. State, 644 So.2d 1284 (Ala.Cr.App.1994), this Court stated:
"... [I]n order to establish the necessity for a new trial based on newly discovered evidence, the appellant must prove: (1) that the evidence was discovered after the trial; (2) that the evidence could not have been discovered prior to trial by due diligence on the part of the movant; (3) that the evidence is material to the issue of the appellant's guilt; (4) that the evidence is not merely cumulative or impeaching; and (5) that the evidence would probably change the outcome *847 if a new trial was granted.... The trial court is entitled to great deference in determining whether newly discovered evidence warrants a new trial and that decision will not be reversed absent a clear abuse of discretion."
644 So.2d at 1289. Hall's testimony fails to meet most of the elements required for newly discovered evidence, and is, in fact, contradicted by two of his own earlier statements. Furthermore, "a condition to the granting of a new trial on the basis of newly discovered evidence is that the trial court must believe the evidence presented." McMillian v. State, 594 So.2d 1253, 1264 (Ala.Cr.App.1991), remanded, 594 So.2d 1288 (Ala.1992), rev'd on return to remand on other grounds, 616 So.2d 933 (Ala.Cr.App.1993).
The trial court did not abuse its discretion in denying the appellant's motion for new trial.

IX.
The appellant next contends that the failure of a prospective juror to respond candidly to questions posed during voir dire deprived him of a fair trial, and that the trial court committed reversible error by denying his motion for a new trial based on this ground.
The appellant indicates that a prospective juror was asked several questions on voir dire concerning whether he knew or was familiar with the victim, Clarene Haskew. In fact, both the victim and the prospective juror were former teachers, and the potential juror was asked specifically whether he "knew" Mrs. Haskew during her lifetime. He responded that he did not.
Thereafter, during the appellant's motion for new trial, the potential juror was called as a witness, and was again asked whether he had known the victim. Armstrong admitted that he "knew" that Mrs. Haskew was a retired teacher, but said that he had never met her and that he did not even know what she looked like. He did state that he had noticed a picture of Mrs. Haskew that had been printed in the newspaper after her death.
The appellant states that his right to a "fair and impartial" trial was violated when the potential juror deliberately concealed or misstated information concerning Mrs. Haskew and that the omitted information prevented him from using one of his peremptory challenges to remove this potential juror from his jury.
"`We start with the basic constitutional premise that every person is entitled to an impartial jury [pursuant to the Sixth Amendment to the United States Constitution].' Knight v. State, 675 So.2d 487, 493-94 (Ala.Cr.App.1995), cert. denied, 675 So.2d 502 (Ala.1996). `It is fundamental to our system of impartial justice that "`[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes.'"' State v.Freeman, 605 So.2d 1258, 1259 (Ala.Cr.App.1992) (quoting Ex parte O'Leary, 438 So.2d 1372, 1373 (Ala.1983), quoting in turn Ex parte O'Leary, 417 So.2d 232, 240 (Ala.1982)). `Voir dire' is an ancient phrase which literally means `to speak the truth.' W. LaFave & J. Israel, Criminal Procedure 22.3(a) (2d. ed.1992). `"Where the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right of challenge for cause, and is deceived into foregoing his right of peremptory challenge."' Ex parte Ledbetter, 404 So.2d 731, 733 (Ala.1981) (quoting Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944)). `Failure to enforce the right to elicit from prospective jurors truthful answers to material questions renders hollow the right of peremptory challenge.' Knight v. State, 675 So.2d at 494 (quoting Mitchell v. State, 458 So.2d 819, 821 (Fla.Dist.Ct. App.1984)).

*848 "In addressing the issue whether a defendant was deprived of the right to exercise peremptory strikes based on truthful answers from prospective jurors, the Alabama Supreme Court recently reiterated the test to be `whether the defendant might have been prejudiced by a veniremember's failure to make a proper response.' Ex parte Stewart, 659 So.2d 122, 124 (Ala.1993) [emphasis added in Tomlin]. This test casts a `light burden' on the defendant. Cf. Ex parte Lasley, 505 So.2d 1263, 1264 (Ala.1987) (stated in regard to the test of whether juror misconduct might have influenced the verdict).
"`Although the factors upon which the trial court's determination of prejudice is made must necessarily vary from case to case, some of the factors which other courts have considered pertinent are: temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.'" Johnson v. State, 536 So.2d 957, 958 (Ala.Cr.App. 1987), cert. denied, 490 U.S. 1046, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989) (quoting Smithson v. State, 50 Ala. App. 318, 320-21, 278 So.2d 766 (1973)). See also Campbell v. Williams, 638 So.2d 804, 813 (Ala. 1994), cert. denied, 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 121 (1994). `Thus, the facts in each case must be considered individually and much will remain in the discretion of the trial judge.' Parish v. State, 480 So.2d 29, 30 (Ala.Cr.App.1985)."
Tomlin v. State, 695 So.2d 157, 169-70 (Ala.Cr.App.1996).
In the present case, the appellant suffered no prejudice as a result of the witness's alleged failure to fully disclose; thus, the trial court correctly denied the appellant's motion for a new trial based on this ground.
Although the question of whether the juror "knew" the victim was perhaps ambiguous, the juror answered it truthfully. His testimony during the hearing on the motion for a new trial was that he was aware that Mrs. Haskew had been a teacher in the county, but that he had never met her and that he did not even know what she looked like. With respect to the juror's inadvertence or willfulness in his failure to recollect, any variance between the witness's answers during voir dire and his testimony during the hearing on the motion for a new trial was attributable to the fact that he was responding to different questions, not to any lack of candor on the part of the witness. Finally, with respect to materiality, none of the testimony offered by the potential juror during the appellant's hearing on his motion for a new trial was material to any issue raised at trial.
The record is devoid of any evidence of false testimony or lack of candor by the witness during voir dire. Neither is there any evidence in the record that the appellant was deprived of his right to "strike a petit jury from a panel of fair-minded, impartial prospective jurors." Hunter v. State, 585 So.2d 220 (Ala.Cr.App.1991).

X.

A.
The appellant contends certain rulings by the trial courtdisallowing expert testimony on an ultimate issue where the testimony might have been of assistance to the laypersondeprived him of his right to a fair trial and to due process of law.
The record indicates that, after asking Investigator Benson, who the parties stipulated was an expert in investigation techniques and procedures, some specific questions about this particular case, the appellant attempted to ask Benson whether he had formed an opinion as to who *849 had shot and killed the victim. The State immediately objected to the question, and the trial court sustained the objection. The appellant then asked the witness, "Do you have an opinion, based upon your complete investigation, as to who shot Mrs. Haskew?" Once again the State objected and the trial court again sustained the objection.
The trend of Alabama appellate courts is to allow expert testimony as to an "ultimate issue" if that testimony would aid or assist the jury. In Bailey v. State, 574 So.2d 1001 (Ala.Cr.App.1990), this Court stated the following concerning expert testimony regarding the "ultimate issue":
"The admissibility of expert opinions is authorized in this state by § 12-21-160, which reads: `The opinions of an expert on any questions of science, skill, trade, or like questions, are always admissible; and such opinions may be given on the facts as proved by other witnesses.' The criterion for admission of expert testimony is that the witness, by study, practice, experience, or observation as to a particular subject should have acquired knowledge beyond that of an ordinary witness; an expert witness is one who can enlighten the jury more than the average man on the street, one whose knowledge extends beyond or supersedes that of an ordinary witness, or one who is shown, either by training or experience, to be better informed than a hypothetical average juror. Charles v. State, 350 So.2d 730 (Ala.Cr.App.1977); C. Gamble, McElroy's Alabama Evidence 127.01(5) (3d ed.1977). Whether a witness is sufficiently qualified to testify as an expert is a question for the trial court in its discretion to resolve, and its ruling will not be disturbed on appeal unless there has been abuse of that discretion. Johnson v. State, 378 So.2d 1164 (Ala.Cr.App.), writ quashed, 378 So.2d 1173 (Ala.1979); Radney v. State, 342 So.2d 942 (Ala.Cr.App.1976), cert. denied, 342 So.2d 947 (Ala.1977); C. Gamble, supra, at § 127.01(5).
"`It has been held traditionally in this country that an expert witness cannot give his opinion upon an ultimate issue in the case.' C. Gamble, supra, at § 127.01(5). The rationale underpinning the `ultimate issue rule' is that expert opinion should not be permitted to invade the province of the jury. Id. There are Alabama cases upholding this traditional rule. Colvin v. State, 247 Ala. 55, 22 So.2d 548 (1945); see C. Gamble, supra, at § 127.01(5). However, the modern trend is in the direction of permitting experts to give their opinions upon ultimate issues, of which the final determination rests with the jury:
"`Despite the restrictive rule in the foregoing paragraph, however, there appears to be a modern trend in the direction of permitting experts to give their opinions upon ultimate issues whose final determination rests with the jury. The basic theory underlying the decisions forming this trend is that the expert should be allowed to give his opinion upon an ultimate issue if that will aid the jury in its decision. The Alabama courts have adopted language to the effect that because a question propounded to an expert witness will elicit an opinion from him in practical affirmation or disaffirmation of a material issue in a case will not suffice to render the question improper.'
"C. Gamble, supra, at § 127.01(5). (Footnotes omitted.)
"`The problem regarding the ultimate issue limitation is simply that in complex cases involving issues beyond the abilities of laymen, a jury may need an expert's opinion on the ultimate issue in order to reach a fair verdict. Opinion on the issues of identity, value, insanity, and intoxication, for instance, all border on what would be considered ultimate fact issues, yet they are generally held admissible.'

*850 "A. Moenssens and F. Inbau, Scientific Evidence in Criminal Cases, § 1.18(2) (2d ed.1978). See 7 Wigmore, Evidence 1920-1921 (3d ed.1940); 2 Wharton's Criminal Evidence § 957 (C. Torcia 11th ed.1935). See also, Fed.R.Evid. 704."
Bailey v. State, 574 So.2d 1001, 1002-03 (Ala.Cr.App.1990).
Thus, caselaw has supported the trial court's decision to allow expert testimony as to the ultimate issue where the evidence and issues are complex and where the testimony would assist the jurors in understanding the evidence.
However, the present case presents no such problems; there are no complicated issues or evidentiary matters that Investigator Benson's testimony would aid the jury in understanding. Moreover, because Benson's opinion as to who shot Mrs. Haskew was not admissible, the appellant had no constitutional right to confront and question him about that opinion. Harrell v. State, 470 So.2d 1303, 1306 (Ala.Cr.App.1984), aff'd, 470 So.2d 1309 (Ala.1985), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). See also United States v. Pritchett, 699 F.2d 317 (6th Cir.1983). The trial judge has discretion to limit cross-examination after the accused has been afforded the "constitutionally required threshold level of inquiry. "United States v. Tracey, 675 F.2d 433, 437 (1st Cir.1982). The record indicates that the appellant continued to cross-examine Benson extensively, even after the trial court's ruling.
This case was tried on a complicity theory in which the State established that both the appellant and Hall aided and abetted, assisted, and encouraged each other to commit the crime charged. Accordingly, even if the jury found that Hall killed Mrs. Haskew, it could still find Travis guilty of capital murder if he intentionally aided and abetted.

B.
The appellant argues that the trial court erred to reversal by allowing Ed Shad to testify over his objection regarding the bill of sale for the pistol used to kill Mrs. Haskew. He argues that the bill of sale Ed Shad's testimony relates to is hearsay, and thus inadmissible, citing C. Gamble, McElroy's Alabama Evidence, § 242.01(1); Fain v. State, 591 So.2d 564, 565 (Ala.Cr.App.1991).
The appellant concedes in his brief that he did not expressly object to the testimony of Ed Shad. Accordingly, this issue must be reviewed under the plain error standard.
Ed Shad's testimony did not constitute hearsay. "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." C. Gamble, McElroy's Alabama Evidence § 242.01(a) (5th ed.1996); Rule 801(c), Alabama Rules of Evidence. Ed Shad merely described the Rossi that he had purchased years earlier as a "Rossi.38 special medium frame five-shot" pistol. He stated that he had given the Rossi pistol to his former wife, then mentioned that he still possessed the bill of sale for the Rossi revolver. He further stated that the bill of sale contained the pistol's serial number, and mentioned that the bill of sale was the original receipt that he received when he purchased the pistol. Shad's testimony did not involve information that was outside the scope of his own personal knowledge; it did not involve information that had been told to him by another person. Thus, he was testifying to events to which he was a party. See generally, Bowden v. State, 542 So.2d 335 (Ala.Cr. App.1989).
For the above reasons, this Court finds no error in the admission of Ed Shad's testimony into evidence.
We also are not persuaded by the appellant's argument that the bill of sale for the Rossi pistol was hearsay, and *851 therefore inadmissible as evidence in this case. "[E]vidence is called hearsay when its probative force depends, in whole or in part, on the competency and credibility of some other person than the witness by whom it is sought to produce it; it is primarily testimony which consists in a narration by one person of matters told him by another...." Bowden v. State, 542 So.2d at 339.
In this instance, no other person was needed to establish that the bill of sale is what it purports to be; either the serial numbers on the bill of sale match those on the Rossi pistol, which Ed Shad described in detail, or they do not. There was no claim concerning any altering of the bill of sale and no indication of any changes to the document.
Furthermore, error, if any, in the admission of the bill of sale would be harmless. Ed Shad's testimony was clearly sufficient to identify the Rossi pistol; the document simply furnished additional evidence of the pistol's origin and ownership.

C.
The appellant argues that the trial court committed reversible error by refusing to allow him to ask Investigator Benson whether anyone had drawn a pentagram in Benson's presence that was similar to the one found on one of the walls of the victim's house.
The record indicates that, after advising codefendant Hall of his Miranda rights, Investigator Benson began questioning Hall about events that had occurred in Mrs. Haskew's house, and also asked Hall to recreate some of the drawings found in the house, referring to characterized pentagrams from what Benson described as "satanic cults." The State moved to exclude testimony regarding these drawings, and the trial court granted the State's motion on the authority of Flowers v. State, 586 So.2d 978, 986 (Ala. Cr.App.1991), cert. denied, 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992).
"As a general rule, an accused may introduce any legal evidence that tends to show that someone else committed the crime for which he is charged. Green v. State, 258 Ala. 471, 64 So.2d 84 (1953). See generally C. Gamble, McElroy's Alabama Evidence, § 48.01(1) (3rd ed.1977); Schroeder, Hoffman and Thigpen, Alabama Evidence, § 4-4(a)(c) (1987).
"However, hearsay evidence is not legal evidence and is not admissible to show that someone other than the accused committed the offense at issue. Houston v. State, 208 Ala. 660, 95 So. 145 (1923). See also McDonald v. State, 241 Ala. 172, 1 So.2d 658 (1941); Morris v. State, 25 Ala.App. 175, 142 So. 685 (1932).
"`A defendant can disprove his guilt by proving the guilt of some other person. Brown v. State, 120 Ala. 342, 25 South. 182; McDonald v. State, 165 Ala. 85, 51 South. 629. But this must be done by legal evidence, and not by the testimony of witnesses who heard another admit that he committed the offense; this is the merest hearsay is but an extrajudicial confession or admission not admissible in evidence. Welsh v. State, 96 Ala. 92, 11 South. 450; Underhill on Criminal Evidence (2d Ed.) p. 276, § 145."
"Houston, 208 Ala. at 663, 95 So. 145.
"Furthermore,
"`[e]ven though one accused of a crime may show his innocence by proof of the guilt of another, provided the evidence relates to the res gestae of the offense, such evidence must exonerate the accused. As stated in Blevins v. State, 51 Ala.App. 214, 283 So.2d 664 (1973):
"`"While it is always proper and relevant for accused to show that someone else committed the crime without his aid or participation, the admissibility of evidence offered to establish such fact depends on the circumstances of *852 the case as well as the character of the evidence offered; but in general competent evidence which tends to prove that another committed the crime for which the accused is being tried is admissible if it is inconsistent with the guilt of the accused.' (Emphasis supplied). (283 So.2d at 670)"
"Allen v. State, 382 So.2d 1147, 1156 (Ala.Crim.App.), cert. denied, 382 So.2d 1158 (Ala.1980).
"Here, the excluded evidence would not have exonerated this appellant. It was merely evidence that [the appellant] may have also been present at the victim's house on the night in question and may have also participated in her death. This evidence is in no way inconsistent with the appellant's guilt. In fact, it is more consistent with the appellant's guilt because this evidence placed him at the scene of the crime!"
Thomas v. State, 539 So.2d 375, 395 (emphasis in original).
The excluded evidence would not have exonerated the appellant. The only inference that could be drawn from this evidence was that Hall was present when Mrs. Haskew was killed. That, however, does not exonerate the appellant or exclude the possibility that he, too, was present when the victim was killed, or that he took part in the murder.

XI.
The appellant next contends that he was denied a fundamentally fair trial and sentencing hearing, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and Alabama law, because of the State's alleged misconduct.

A.
The appellant argues that, at both phases of his trial, the prosecutor improperly commented on his decision not to testify.
During his guilt phase opening statement, the prosecutor stated, "This is what the State expects to prove in this case. I ask you to listen to the defense counsel and what they have to offer." The State had just completed its opening statement, and the prosecutor's comments were simply transitional, a polite form of acknowledging defense counsel before the State began its opening statement. There was no comment made by the State regarding the fact that the appellant would not testify. Ex parte Payne, 683 So.2d 458 (1996).

B.
Thereafter, during the State's guilt phase closing argument, the following comments occurred:
"THE PROSECUTOR: What could have been more horrible than to have somebody break into your house, beat you, strangle you and then put a pistol up to you and shoot you twice in the back of the head.... We don't know what suffering she went through. Nobody can tell you that, or at least, I can't tell you that. Dr. Wanger couldn't tell you that. And someone ought to pay for that.... And that person sits right over there. You look at this evidence and I submit to you that there should be no doubt in your mind that he is guilty of capital murder."
Clearly the prosecutor's remark that "[a]nd that person sits right over there" related to his earlier comment that "someone ought to pay for that." This was a proper exhortation for justice and punishment for the crime. DeBruce v. State, 651 So.2d 599, 612-13 (Ala.Cr.App.1993).

C.
Finally, during the closing argument of the penalty phase of appellant's trial, the prosecutor commented, "There has been no remorse. These lawyers are remorseful. There has been no remorse." Immediately thereafter, the appellant requested a bench conference, and moved for a mistrial. The trial court immediately gave the following curative instruction:

*853 "THE COURT: Ladies and gentlemen, you shall not consider the last remarks by the Prosecutor. They were not proper. There's no evidence in this case upon which Prosecutor's remarks could be based nor is there a lack of evidence upon which the Prosecutor's remarks could be based. You shall not consider the Prosecutor's remarks in any way, shape, or form. They are completely improper and may not be considered by you for any purpose in this case."
The prosecutor's comments regarding remorse came during the penalty phase of this case, after the jury had already found the appellant guilty of capital murder. Remorse is a proper subject of comment during sentencing. Dobyne v. State, 672 So.2d 1319, 1348-49 (Ala.Cr. App.1994). Moreover, the statement that no remorse had been shown was a proper inference from the evidence. Taylor v. State, 666 So.2d 36, 55 (Ala.Cr.App.1994) (prosecutor's comment during penalty phase that "[t]here's absolutely no showing of remorse or grief" was not a comment on failure to testify).
While a reasonable juror might have interpreted the prosecutor's remark to be a comment on the appellant's failure to testify, the prompt and thorough curative instructions by the trial court eradicates any error.
"`"In a case which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error there must be a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So.2d 1231, 1234 (Ala.1979)." Ex parte Williams, 461 So.2d 852, 854 (Ala.1984).'
"Funches v. State, 518 So.2d 781, 785 (Ala.Cr.App.1987).
"In Christian v. State, 502 So.2d 868 (Ala.Cr.App.1986), this Court noted that error resulting from the prosecutor's improper comments as to the defendant's failure to testify may be cured by prompt instructions by the trial court, and we wrote the following:
"`As it appears that our Supreme Court still adheres to the principle that the effects of such improper remarks can be cured by prompt instructions, we must determine if the curative instructions in this case were sufficient. In Whitt [v. State, 370 So.2d 736 (Ala. 1979)], the court stated that "we will consider the circumstances of each case on its own, considering the type of remark, whether reply in kind or not, whether promptly objected to, and the appropriateness of the trial judge's instructions." The court went on to suggest:
"`"[A]t a minimum the trial judge must sustain the objection, and should then promptly and vigorously give appropriate instructions to the jury. Such instructions should include that such remarks were improper and to disregard them; that statements of counsel are not evidence; that under the law the defendant has the privilege to testify in his own behalf or not; that he cannot be compelled to testify against himself; and, that no presumption of guilt or inference of any kind should be drawn from his failure to testify." Whitt, at 739.'
"Id. at 870. See also, Lockett v. State 505 So.2d 1281, 1286-87 (Ala.Cr.App. 1986)."
Hammonds v. State, 549 So.2d 993, 994-95 (Ala.Cr.App.1989).
In addition to curative instructions, the trial court informed defense counsel that he could draft a curative instruction that the court would give as part of its oral charge. Counsel replied that "we will attempt to draft" such an instruction, but stated that he did not believe that it could be done. The record is unclear as to what defense counsel drafted, although the record indicates that counsel handed the court something identified as a curative instruction.

*854 D.
The appellant next contends that the State violated Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 2639-40, 86 L.Ed.2d 231 (1985), in that it diminished the role of the jury by making two references to an "advisory verdict," one of which was allegedly made at the end of the prosecutor's opening statement in the guilt phase, and the second of which was made at the end of his closing in the penalty phase. The appellant alleges that the error caused by these references was compounded by the trial court when it used the words "recommend" and "recommendation" in the curative instruction it gave following the second reference by the prosecutor.
In Martin v. State, 548 So.2d 488 (Ala. Cr.App.1988), aff'd, 548 So.2d 496 (Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), this Court reiterated the rule enunciated in Caldwell v. Mississippi, that the prosecutor could not mislead a jury to believe that, while it may impose a death sentence upon a defendant, the ultimate responsibility for determining the appropriateness of the death sentence lay elsewhere. The Martin Court stated as follows:
"Under Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), `it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was `advisory' and a `recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell. `[C]omments which accurately explain the respective functions of the judge and jury are permissible under Caldwell "as long as the significance of [the jury's] recommendation is adequately stressed."' Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir.1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986), modified, Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987); and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr. App.1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: `The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra.'"
548 So.2d at 494.
Here, as in Martin, the comments by the prosecutor and the trial judge correctly informed the jury of its role in the sentencing process. Because the remarks made in this case did not tend to mislead or misinform the jury as to its role in the sentencing phase, they were not improper under Caldwell.

XII.
The appellant argues that the trial court erred to reversal by failing to remove four veniremembers for cause. The appellant argues that each of these veniremembers should have been removed for cause because each maintained views on capital punishment that "would prevent or substantially impair the performance of his *855 duties as a juror in accordance with his instructions and oath." Bracewell v. State, 506 So.2d 354, 358 (Ala.Cr.App.1986). See also, Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).
In Ex parte Windsor, 683 So.2d 1042 (Ala.1996), the Alabama Supreme Court held that the test to be used to determine whether a prospective juror should be excused for cause for having a fixed opinion is whether the juror could set aside his or her opinion and decide the case based upon the evidence and the law. In affirming this Court's decision, the Windsor Court stated, in pertinent part, as follows:
"`Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Cr.App. 1977), cert. denied, 356 So.2d 234 (Ala.), cert. denied, 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 132 (1978); see Willingham v. State, 262 Ala. 550, 552, 80 So.2d 280 (1955); Mahan v. State, 508 So.2d 1180 (Ala.Cr.App. 1986). This determination, again, is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence.'
"Knop v. McCain, 561 So.2d 229, 232 (Ala.1989). See also, Jenkins v. State, 627 So.2d 1034, 1043 (Ala.Cr.App.1992)."
Thereafter, the Windsor Court held that the trial court was in the best position to determine whether the prospective juror should be struck for cause, and noted that the trial judge's ruling is entitled to great deference. "`A trial judge's ruling on a challenge for cause is accorded great weight and will not be disturbed on appeal unless it is clearly erroneous and represents an abuse of discretion.' Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995), citing Morrison v. State, 601 So.2d 165 (Ala.Cr.App.1992), and Hunter v. State, 585 So.2d 220 (Ala.Cr.App.1991)." Ex parte Windsor, supra, at 1048.
On voir dire, a potential juror stated that before he could recommend the death penalty, he would have to hear the evidence presented by the parties. He stated that he was not opposed to the death penalty, but also said that he would not automatically vote in favor of it. He indicated that he would follow the court's instructions and would keep an open mind.
Another potential juror initially stated that he could base his opinion as to what penalty was appropriate on the evidence brought out in court and on the judge's instructions. He stated that he could follow the law and give the appellant a fair trial. On cross-examination, however, he said that he believed in "an eye for an eye" and that this belief was "unshakable." When questioned again as to the effect of his personal beliefs on his ability to follow the law, he indicated that he would listen to all the evidence and weigh the aggravating and mitigating circumstances, as instructed. Finally, the trial judge personally questioned him about his ability to follow the law as the court instructed him, and he specifically stated that the personal opinion that he had expressed earlier would not prevent him from doing this, and that he felt he could recommend a sentence of life imprisonment without the possibility of parole if that appeared to be proper after he had weighed all the aggravating and mitigating circumstances. As this Court held in Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995):
"`"Thus, where a juror states that he has opinions but that he would try the case fairly and impartially according to *856 the law and the evidence and that he would not allow his opinion to influence his decision, it is not error for a trial judge to deny a challenge for cause. Howard v. State, 420 So.2d 828, 831 (Ala.Cr.App.1982). `A juror who brings his thoughts out into the open in response to voir dire questions may be the one who later "bends over backwards" to be fair....' Clark v. State, 443 So.2d 1287, 1289 (Ala.Cr.App.1983). "Mahan v. State, 508 So.2d 1180 (Ala.Cr.App. 1986).'"
632 So.2d at 520-21, quoting Kinder v. State, 515 So.2d 55, 60-61 (Ala.Cr.App. 1986).
Another potential juror also initially stated that she had "no problem" with the death penalty and that she would weigh the aggravating and mitigating circumstances before reaching a decision as to the appropriate punishment. However, on cross-examination, she indicated that, if the evidence showed that the murder was premeditated, the punishment should be death. Subsequently, when asked by the trial court whether she could weigh the aggravating and mitigating circumstances as initially explained by the district attorney, she stated that she could do so. She stated that she would have to "hear the evidence" before reaching a decision as to the punishment in this case. Harris, supra; Kinder, supra.
Finally, the last of these potential jurors also stated on direct examination that she could weigh the aggravating and mitigating circumstances, and could reach a decision as to the appropriate punishment fairly and impartially. On cross-examination, however, she stated, "I just think if somebody is guilty, with all the evidenceand what they've done and there's no other way, yes, they should get the death penalty." She indicated that this was a firm, unshakable opinion. Nevertheless, on redirect examination, she explained that her answer presumed that she had already weighed the aggravating and mitigating circumstances offered into evidence in the sentencing phase of the trial, and that after doing this she had no choice but to vote for death.
"A trial court's ruling on challenges for cause based on alleged bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion. Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala.1981). To justify a challenge for cause there must be a statutory bias or some matter that imports absolute bias or favor and leaves nothing to the discretion of the trial court. Pardue v. State, 571 So.2d 320 (Ala.Cr.App.1989), rev'd on other grounds, 571 So.2d 333 (Ala.1990); Minshew v. State, 542 So.2d 307 (Ala.Cr. App.1988). Even proof that the veniremember is biased or has a fixed opinion is insufficient. There must be proof that the opinion was so fixed that it would bias the verdict of the veniremember. Clark v. State, 443 So.2d 1287 (Ala.Cr. App.1983). If the veniremember indicates that he or she can lay aside that impression or opinion and render a verdict based on the evidence presented in court, the juror is not subject to challenge for cause. Minshew v. State; Mahan v. State, 508 So.2d 1180 (Ala.Cr. App.1986)."
Smith v. State, 698 So.2d 189, 200 (Ala. Cr.App.1996).
A review of the voir dire examination of these four prospective jurors indicates that the trial court's failure to remove them for cause was not clearly erroneous and did not represent an abuse of discretion.

XIII.
The appellant next argues that the admission of evidence of crimes not charged in the indictment violated his right to a fair trial. Specifically, he states that evidence relating to the burglary of Nellie Shad's home, evidence of the theft of Clarene Haskew's automobile, and evidence *857 of the damage to Clarene Haskew's truck was inadmissible.
"As a general rule, when a person is being tried for the alleged commission of one crime, evidence that he or she committed another illegal act that is not now charged is generally inadmissible. McLemore v. State, 562 So.2d 639 (Ala. Cr.App.1989); Gainer v. State, 553 So.2d 673 (Ala.Cr.App.1989); C. Gamble, McElroy's Alabama Evidence § 69.01(1) (4th ed.1991). An exception to this rule is that that evidence of the other crime is admissible if the other crime is part of the res gestae, or the transactions inseparable from the crime charged. Gainer; McElroy's, § 69.01(3)."
Ex parte Land, 678 So.2d 224 at 243.
In Bush v. State, 695 So.2d 70 (Ala.Cr. App.1995), aff'd, 695 So.2d 138 (Ala.1997), this Court addressed the admissibility of crimes not charged in appellant's indictment when those acts are so inseparable from the offense charged as to form one continuous act.
"Evidence of any offense other than that specifically charged is prima facie inadmissible. Nicks v. State, 521 So.2d 1018 (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). However, evidence of collateral crimes or bad acts is admissible as part of the prosecutor's case if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty of the charged offense because of his past misdeeds. Nicks v. State; Brewer v. State, 440 So.2d 1155 (Ala.Cr.App.1983); C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (4th ed.1991). Before its probative value will be held to outweigh its potential prejudicial effect, the evidence of a collateral crime must not only be relevant, it must also be reasonably necessary to the state's case, and it must be plain and conclusive. Averette v. State, 469 So.2d 1371 (Ala.Cr.App.1985). If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime. Nelson v. State, 511 So.2d 225, 234 (Ala.Cr.App.1986), aff'd, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Weatherford v. State, 369 So.2d 863 (Ala.Cr.App.), cert. denied, 369 So.2d 873 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979); McElroy's, § 69.02(8). The generally recognized exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted are as follows:
"`(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'
"Nelson v. State, 511 So.2d 225, 233 (Ala.Cr.App.1986); Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Nicks v. State. If the evidence is not so remote as to lose its relevancy, the decision to allow or to not allow evidence of collateral crimes or acts as part of the state's case rests in the sound discretion of the trial court. McGhee v. State, 333 So.2d 865 (Ala.Cr.App.1976)."
695 So.2d at 85.
Moreover, as we held in Twilley v. State, 472 So.2d 1130, 1135-37 (Ala.Cr.App.1985):

*858 "The rule has been stated many times by the appellate courts of this State that in a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. Byrd v. State, 257 Ala. 100, 57 So.2d 388 (1952); Keith v. State, 253 Ala. 670, 46 So.2d 705 (1950); Levert v. State, 252 Ala. 308, 42 So.2d 532 (1949); Stallings v. State, 249 Ala. 580, 32 So.2d 236 (1947); McCoy v. State, 232 Ala. 104, 166 So. 769 (1936); Jordan v. State, 81 Ala. 20, 1 So. 577 (1887); Golden v. State, 39 Ala.App. 361, 103 So.2d 52, reversed on other grounds, 267 Ala. 456, 103 So.2d 62 (1958); Sexton v. State, 28 Ala.App. 59, 180 So. 729 (1937); Newman v. State, 25 Ala.App. 526, 149 So. 724 (1933); Roberts v. State, 25 Ala. App. 477, 149 So. 356 (1933)."
In the present case, the collateral crimes involved were all part of one continuous criminal transaction, or res gestae, and the evidence relating to each offense was inseparable from evidence relating to the others. Ex parte Land, supra. Bush v. State, supra; Twilley v. State, supra. The appellant and his codefendant broke into Nellie Shad's house and stole a weapon. When the two men were taken to the appellant's home by Paula Shiver on December 14, 1991, the appellant stated to Shiver that he wanted to see his parents and get his car. As the appellant apparently did not have a car, it could reasonably be assumed that he intended to get one elsewhere. The burglary of Ms. Shad's home, the theft of Clarene Haskew's car, and the damage to her truck were clearly part of one continuous criminal act of the appellant.
Furthermore, all the events involved happened within hours of each other. Coleman v. State, 487 So.2d 1380, 1385 (Ala.Cr.App.1986).

XIV.
The appellant argues that the trial court committed reversible error by admitting evidence of flight and by giving the jury an instruction regarding flight.
In Player v. State, 568 So.2d 370, 373 (Ala.Cr.App.1990), quoting Ward v. State, 497 So.2d 571, 573 (Ala.Cr.App.), reversed on other grounds, 497 So.2d 575 (Ala.1986), this Court stated that "`[i]t is settled law that in criminal cases the flight or attempted flight of a defendant is a circumstance which the jury may take into consideration.'" In Childers v. State, 338 So.2d 1058 (Ala.Cr.App.1976), the appellant, aided and abetted in the commission of robbery by transporting other participants of the crime to and from the scene, and was found some months later in Michigan, without explanation as to what he had been doing during those months. The defendant in Childers v. State, supra, argued that it was error to include an instruction on flight in the court's oral charge. In holding to the contrary, this Court stated as follows:
"In White v. State, 111 Ala. 92, 21 So. 330, in quoting from Bowles v. State, 58 Ala. 335, the court said:
"`"All evasions or attempts to evade justice, by a person suspected or charged with crime, are circumstances from which a consciousness of guilt may be inferred, if connected with other criminating facts. Of themselves they may not warrant a conviction, but they are relevant as evidence, and the weight to which they are entitled it is the province of the jury to determine, under proper instructions from the court.... Flight for which no proper motive can be assigned, and which remains unexplained, is a circumstance, all authorities agree, it is proper to submit to the jury, in connection with other evidence tending to show the guilt of the accused...."'
"In Tiner v. State, 279 Ala. 126, 182 So.2d 859, the court stated:
"`Flight, though not conclusive, is usually evidence of guilt, and if a suspect flees at the approach of officers *859 having knowledge of, or reasonable cause to believe, that a felony has been committed, there can be no doubt but that such conduct furnishes a reasonable cause for believing that the suspect committed the felony.'"
338 So.2d at 1061.
In Rogers v. State, 630 So.2d 88 (Ala. 1992), the Alabama Supreme Court discussed the circumstances under which an instruction regarding flight is proper. The Rogers Court, quoting Ex parte Jones, 541 So.2d 1052 (Ala.1989), addressed the balancing of evidence of flight against its prejudicial effect:
"`Evidence of flight has long been allowed in the courts of Alabama, and the State is generally given wide latitude in proving things that occurred during the accused's flight. C. Gamble, McElroy's Alabama Evidence, § 190.01(1) at 381 (3d ed.1977)....
". . . .
"`Alabama cases clearly hold that evidence of flight that is not combined with other criminative circumstances has little probative force. The teaching of Levison [v. State, 54 Ala. 520 (1875)], of course, is that care should be used when evidence of flight is presented. The United States Supreme Court has similarly warned, on more than one occasion, of the dangers in the introduction of evidence of flight.... Further, the United States Supreme Court has "consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime."... Nevertheless, the rule still remains that such evidence is admissible in a proper case.

"The basic rule for the introduction of evidence of flight was set forth in the early Alabama case of Bowles v. State, 58 Ala. 335, 338 (1877):
"`"All evasions, or attempts to evade justice, by a person suspected or charged with crime, are circumstances from which a consciousness of guilt may be inferred, if connected with other criminating facts. Of themselves, they may not warrant a conviction, but they are relevant as evidence, and the weight to which they are entitled, it is the province of the jury to determine, under proper instructions from the court. [Citations omitted.] Flight, for which no proper motive can be assigned, and which remains unexplained, is a circumstance all authorities agree it is proper to submit to the jury, in connection with other evidence tending to show the guilt of the accused. In the old common law, the rule which passed into a maxim, was, that flight was equivalent to a confession of guilt: fatetur facinus qui judicium fugit. At the present day it is regarded as a mere criminative circumstance, indicative of a consciousness of guilt, and of an attempt to evade justice, which is subject to infirmative considerations that may deprive it of all force."
". . . .
"`"`In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution... as tending to show the accused's consciousness of guilt. The state is generally given wide latitude or freedom in proving things that occurred during the accused's flight, C. Gamble, McElroy's Alabama Evidence § 190.01(1) (3rd ed.1977). `Evidence of flight is admissible even though it is weak or inconclusive or if several days have passed since the commission of the crime.' Tate v. State, 346 So.2d 515, 520 (Ala.Crim.App.1977). Evidence of flight is admissible even though that evidence involves the commission of other crimes by the accused. For the same reason, evidence that the accused resisted or attempted to avoid arrest is admissible...."'"
630 So.2d at 90-91. The Court further held as follows:

*860 "Thus, in this case, as in Ex parte Jones, supra, at 1057, `the question ... becomes whether the evidence of flight here was so remote or so unconnected with the [crime now charged] that its probative value was outweighed by its prejudicial effect.' As in Ex parte Jones, we think not. Rather, we hold that, under the facts in this case in which the defendants took extreme measures to evade the policewhere the chase was no ordinary chase and, even though the defendants did not actually know that they had been named as suspects in the capital murder, their conduct in fleeing and their conduct in firing at the state trooper pursuing them was such that a jury could infer from it that they were attempting to evade law enforcement officers for some reason other than the ones they statedthe trial court properly admitted the flight evidence and the evidence of collateral offenses."
Id. at 90-92.
In this case, the evidence as to flight was relevant and material, and an instruction regarding flight was appropriate, given the evidence. On the evening of December 15, 1991, the day after Mrs. Haskew's murder, the appellant was staying at the home of Paula Shiver, when Monroe County Sheriff Tom Tate saw Mrs. Haskew's Ford LTD automobile parked in Shiver's yard. When he went to the house, Ms. Shiver apparently announced the Sheriff to the appellant and his codefendant, who immediately ran out the back door of Shiver's house into the woods nearby. Tracking dogs and their handlers from Fountain Prison had been called in to track the two men, who were subsequently located about one and one-half miles from Shiver's house. The police then attempted to persuade the men to lay down their firearms and surrender, but one of them fired his gun. A short gunfight ensued, during which the appellant was wounded.
This evidence supports the trial court's charge on flight.

XV.

A.
The appellant contends that his rights to confrontation and to cross-examine witnesses against him were violated by the admission of certain alleged hearsay statements by Jessie Wiggins, Sheriff Booker, Officer Atkins,[1] Investigator Benson and Ms. Shiver.
With the exception of the questions asked of Sheriff Booker, the questions posed to each of these witnesses were asked and answered before the appellant objected on hearsay grounds at trial, and the appellant's objections therefore came too late. Williams v. State, supra. Accordingly, the appellant's argument as to these witnesses is subject to review under the plain error rule.
Jessie Wiggins testified that the appellant entered her house, with permission, to make a telephone call. When the appellant kept trying to dial a telephone number, apparently without success, Wiggins' husband tried the number, also without success. At one point, the prosecutor asked Wiggins what the appellant had said to her husband, but defense counsel objected before she could respond. Thus, no hearsay testimony was ever offered by the witness. Wiggins did subsequently give her opinion that the telephone number the appellant was dialing was probably a fictitious number, but the court sustained a timely objection to that comment and the comment was excluded.
The testimonies of Sheriff Booker, Officer Atkins, and Investigator *861 Benson were clearly hearsay and were offered for the truth of the matters asserted therein. However, the error was harmless, as it concerned a collateral matter and could not have affected the results of the trial. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Rule 45, Ala.R.App.P. All of the testimony of the investigators that was subject to the appellants' hearsay objections tended to relate to the shoot-out with the appellant. They also testified to the facts of the gunfight, which were admissible. Thus, any error in the admission of the investigators' hearsay testimony was harmless, because the same facts came into evidence through the officers' factual description of what occurred during the gunfight. Testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred. McFarley v. State, 608 So.2d 430, 433 (Ala.Crim.App.1992); Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988).
Finally, the appellant's argument concerning Paula Shiver's alleged hearsay testimony appears to be limited to her statement that the appellant was present in the house when the sheriff arrived there. However, Sheriff Booker and the deputy had also testified as to this fact; therefore, error, if any, was harmless. McFarley v. State, 608 So.2d 430, 433 (Ala. Crim.App.1992); Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988). Thomas v. State, 520 So.2d 223 (Ala.Cr. App.1987), stated:
"`The rule is that testimony apparently illegal upon admission may be rendered prejudicially innocuous by subsequent legal testimony to the same effect or from which the same facts can be inferred.' Yelton v. State, 294 Ala. 340, 342, 317 So.2d 331 (1974). `It is not error to allow the same facts to be again shown against objection when they have already been proven without objection.' Bush v. State, 282 Ala. 134, 139, 209 So.2d 416 (1968)."
Thomas v. State, 520 So.2d 223, 225 (Ala. Cr.App.1987).

B.
The appellant argues that the trial court permitted Deputy Shawn P. Sullivan, Deputy Johnny Blackmon, and Sheriff Edwin Booker to testify as to matters that he contends were immaterial and irrelevant. Appellant therefore contends that his conviction is due to be reversed and this caused remanded for a new trial. All of the testimony he cites relates to the officers' participation in the crime scene investigation, and is both relevant and material to appellant's case. Appellant's argument is therefore without merit.

XVI.

A.
Appellant contends that the State failed to present sufficient evidence to support his conviction for capital murder and death sentence. The appellant further contends that there was no evidence that he was the triggerman, or that he was present when Clarene Haskew was murdered.
"`The standard for appellate review of the sufficiency of the evidence in a case such as this one was aptly set out in Dolvin v. State, 391 So.2d 133 (Ala. 1980):
"`"`In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir.1974); United States v. McGlamory, 441 F.2d 130 *862 (5th Cir.1971); Clark v. United States, 293 F.2d 445 (5th Cir.1961).
"`"`[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir.1969); Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir.1967):
"`"`"Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949.... The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged. McGlamory, 441 F.2d at 135 and 136."'" (Emphasis in original.)
"`391 So.2d at 137-38, quoting Cumbo v. State, 368 So.2d 871, 874 (Ala.Crim.App. 1978), cert. denied, Ex parte Cumbo, 368 So.2d 877 (Ala.1979). Robinette v. State, 531 So.2d 697, 698-99 (Ala.1988).'"
White v. State, 546 So.2d 1014, 1016-17 (Ala.Cr.App.1989).
The record indicates that the State presented sufficient evidence to prove the elements of capital murder committed during a burglary, see, § 13A-5-40(a)(4), Code of Alabama 1975, and to satisfy its burden as to proving complicity.
When the appellant was arrested and searched, the keys to the victim's car were found in one of his pockets. Moreover, a search of his jacket pockets produced some.38 caliber cartridges. While conducting an inventory of the contents of the victim's car, Investigator Benson found a .38 caliber Rossi revolver in the glove box that contained five cartridges. Investigator Benson also found numerous other items taken from the victim's home inside the victim's car, and found a .410 gauge shotgun in the trunk. Ed Shad later identified the pistol discovered by Benson as the one he had given to his former wife, and that was stolen in the burglary of Nellie Shad's home. Dr. Wanger recovered two bullets from the crime scene, as well as a lead fragment obtained during the autopsy of the victim. Dale Carter, a Department of Forensic Sciences firearms and tool expert, stated that, in his opinion, one of the two bullets he received from Dr. Wanger was fired from the Rossi pistol, to the exclusion of all other firearms in existence. Another expert examined the Rossi pistol and the two bullets and reached the same conclusion.
This evidence is more than adequate to allow a jury to reasonably exclude all other reasonable hypotheses than that the appellant was the person who murdered Clarene Haskew.
§ 13A-5-40(c), Code of Alabama 1975, states as follows:
"A defendant who does not personally commit the act of killing which constitutes the murder is not guilty of a capital offense defined in subsection (a) of this section unless that defendant is legally accountable for the murder because of complicity in the murder itself under the provisions of § 13A-2-23, in addition to being guilty of the other elements of the capital offense as defined in subsection (a) of this section."
*863 § 13A-2-23, Code of Alabama 1975, provides:
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
"(1) He procures, induces or causes such other person to commit the offense; or
"(2) He aids or abets such other person in committing the offense; or
"(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make."
This Court has held in Gwin v. State, 456 So.2d 845, 851 (Ala.Cr.App.1984):
"`Aid and abet "comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary."' Jones v. State, 174 Ala. 53, 57, 57 So. 31 (1911), quoted in Radke v. State, 292 Ala. 290, 292, 293 So.2d 314 (1974). If the jury is convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, the fact that the defendant is an aider and abettor is established. Jones, supra; Raiford v. State, 59 Ala. 106, 108 (1877). `The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Fuller v. State, 43 Ala.App. 632, 198 So.2d 625. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence.' Miller v. State, 405 So.2d 41, 46 (Ala.Cr.App.1981); Watkins v. State, 357 So.2d 156, 159 (Ala.Cr.App. 1977), cert. denied, 357 So.2d 161 (Ala. 1978)."
(Emphasis in original.)
Moreover, while mere presence of an individual at the time and place of a crime does not make him a party to the crime, any assistance rendered in furtherance of commission of the offense will suffice.
"`Recognizing the principle that the mere presence of an individual at the time and place of a crime does not make him a party to that crime, it must also be remembered that the words "aid and abet" comprehend all assistance rendered by acts, words of encouragement or support, or presence, actual or constructive, to render assistance should it become necessary. No particular acts are necessary. Radke v. State, 292 Ala. 290, 293 So.2d 314 (1974). The common enterprise or adventure may have been entered into on the spur of the moment without pre-arrangement or preparation. Fuller v. State, 43 Ala.App. 632, 198 So.2d 625 (1966). The appellant's actual participation need not be proved by positive testimony; the jury is to determine whether it exists and the extent of it from the conduct of the parties and all the testimony adduced. Knight v. State, 50 Ala.App. 457, 280 So.2d 163 (1973).'
"Community of purpose may be formed in a flash, and participation and community of purpose may be shown by circumstantial evidence or inferred from the conduct of the participants. Smith v. State, 57 Ala.App. 151, 326 So.2d 680 (1975), cert. denied, 295 Ala. 419, 326 So.2d 686 (1976). Such facts as the defendant's presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participation may be inferred. Smith, supra."
Sanders v. State, 423 So.2d 348, 350-51 (Ala.Cr.App.1982).
Here, the State's circumstantial evidence strongly suggests that the appellant was present when the victim was killed. The appellant either killed Clarene Haskew himself or aided or abetted his codefendant in killing her. The appellant *864 shared in the property taken from her home. Moreover, the .38 cartridges found in the appellant's possession, together with the keys to the victim's car, which contained the death weapon, create a strong inference that the appellant was Mrs. Haskew's killer.

B.
The appellant next argues that the State failed to present sufficient evidence to sentence him to death under Alabama law. Specifically, the appellant argues that the State cannot sentence him to death because, he says, it failed to establish that he had a particularized intent to kill the victim.
As this Court explained in Arthur v. State 711 So.2d 1031, 1057-58 (Ala.Cr.App. 1996):
"`In considering accomplice liability for a capital offense, we must look beyond the general principles, to the following:
"`"`No defendant is guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony murder doctrine. Beck v. State, 396 So.2d 645, 662 (Ala.March 6, 1981); Carnes, Alabama's 1981 Capital Punishment Statute, 42 Ala.Law 456, 468 (1981). See also Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), but see Godbolt v. State, 429 So.2d 1131, 1134 (Ala.Cr.App.1982), holding that Enmund is inapplicable to a defendant who does not receive the death penalty. However, a nontriggerman can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself. Ritter v. State, 375 So.2d 270 (Ala. 1979). `The accomplice liability doctrine may be used to convict a nontriggerman accomplice, if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony.' Ex parte Raines, 429 So.2d 1111, 1112 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983).
"`". . . .
"`"Our duty on appeal was stated in Raines, 429 So.2d at 1113. `To affirm a finding of a "particularized intent to kill," the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.'"
"`Lewis v. State, 456 So.2d 413, 416-17 (Ala.Cr.App.1984).'"
This Court has already addressed the question of whether the trial court properly charged the jury as to a particularized intent to kill; moreover, there was sufficient evidence to support a finding that the appellant possessed the intent to kill. The appellant's argument is therefore without merit.

C.
The appellant next contends that the death sentence is unlawful under the Eighth and Fourteenth Amendments to the United States Constitution, and Art. 1, §§ 6 and 15 of the Alabama Constitution of 1901, because, he says, he was not the triggerman. This is simply a restatement of the previous issue, part XVI. B. of this opinion, which was decided against the appellant.

XVII.

A.
The appellant argues that the aggravating circumstance that the murder was especially heinous, atrocious and cruel when compared with other capital murders, was unconstitutionally vague, unreliable, and overly broad. The appellant failed to object on this specific ground at trial. Therefore, this issue must be reviewed under the plain error standard.
*865 The appellant relies upon the United States Supreme Court's decision in Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The appellant's reliance upon Maynard v. Cartwright, under the facts of this case, is misplaced.
"`[T]his argument has been determined adversely to the appellant in Bui v. State, 551 So.2d 1094 (Ala.Cr. App.1988), affirmed, Ex parte Bui, 551 So.2d 1125 (Ala.1989). This court determined that in Maynard v. Cartwright, supra, the Supreme Court did not strike down this aggravating circumstance as facially unconstitutional, but rather held that it was unconstitutionally applied in that particular case, as the jury was given no guidance as to the facts to which it should pertain. In Bui v. State, supra, this court held that, because the trial judge instructed the jury on the meaning of the words of the aggravating circumstance, and because the trial court applied the correct standard for finding the aggravating circumstance, pursuant to Ex parte [K]yzer, 399 So.2d 330, 334 (Ala.1981), the sentence was not reversible.'
"Williams v. State, 571 So.2d 336 (Ala. Crim.App.1989). In this case, the trial court thoroughly instructed the jury on the meaning of this particular aggravating circumstance and it correctly applied the standard set out in Ex parte Kyzer, 399 So.2d 330 (Ala.1981). The trial court's finding that the capital offenses in this case were particularly heinous, atrocious, and cruel when compared to other capital offenses is certainly supported by the evidence. One can think of few cases in which the brutality of the murders of this case could be exceeded."
Brown v. State 686 So.2d 385, 407 (Ala.Cr. App.1995), aff'd., 686 So.2d 409 (Ala.1996).
In the present case, the trial court properly instructed the jury as to the meaning of this aggravating circumstance. Haney v. State, 603 So.2d 368, 385 (Ala.Cr.App. 1991).

B.
The appellant claims that the trial court's instruction on the "especially heinous, atrocious and cruel" aggravating factor was constitutionally vague, unreliable and overly broad.
This charge closely follows the language of the charge recommended by the Alabama Supreme Court for use in capital cases, and clearly informed the jury as to the type of conduct that must be present before that aggravating factor should be applied.
"[The appellant] relies on Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The instant case is distinguishable from Maynard. Unlike Maynard, the jury here was instructed on the meaning of the words of the aggravating circumstance in the context of capital sentencing. These instructions correctly followed the previously recognized limiting construction of the aggravating circumstance established by the Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), wherein the court stated: `The aggravating circumstance listed in § 13-1-6(8) [now § 13A-5-49(8)] was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' For other cases in which we applied the rule established in Ex parte Kyzer, see Hallford v. State, 548 So.2d 526 (Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (Ala.1989). See also Ex parte Bankhead, 585 So.2d 112 (Ala. 1991); Bush v. State, 431 So.2d 555 (Ala. Cr.App.1982), aff'd, 431 So.2d 563 (Ala. 1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983)."
Haney v. State, 603 So.2d 368, 387 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala.1992), *866 cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
Accordingly, the appellant's claims are without merit.

C.
The appellant argues that the evidence presented in the penalty phase of his trial was insufficient to establish that the killing of Mrs. Haskew was "especially heinous, atrocious, and cruel," when compared with other capital cases.
In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), the Alabama Supreme Court stated: "The aggravating circumstance listed in § 13-1-6(8) [now § 13A-5-49(8)] was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."
At the time of her death, Mrs. Haskew, a 69-year-old widow, was dressed for bed, when the appellant and his codefendant entered into her home. The men destroyed the door to Mrs. Haskew's patio before they reached the door to the house. Once past the patio door, the two men actually ripped apart the door to the house. The State pathologist testified that Mrs. Haskew suffered two bullet wounds to the back of her head, that she had suffered numerous blunt trauma injuries, and that she had been strangled, either by hand or by some unknown object. The hyoid bone in her throat was broken, and there were bruises around her throat. The pathologist determined that Mrs. Haskew died as a result of either blunt trauma or bullet wounds, but was unable to determine the order in which the wounds were inflicted.
"This court has held similar killings to be especially heinous, atrocious, or cruel when compared to other capital offenses.
"`When a defendant deliberately shoots a victim in the head in a calculated fashion, after the victim has already been rendered helpless by [prior] gunshots ..., such "extremely wicked or shockingly evil" action may be characterized as especially heinous, atrocious, or cruel.' Lawhorn v. State, 581 So.2d 1159 (Ala.Crim.App. 1990), aff'd, 581 So.2d 1179 (Ala.1991), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991)."
Clark v. State, 728 So.2d 1117, 1125 (Ala. Cr.App.1996). See also, Ex parte Slaton, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); Ex parte Hunt, 659 So.2d 960 (Ala. 1995), cert. denied, 516 U.S. 880, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995); Boyd v. State 715 So.2d 825 (Ala.Cr.App.1997).

XVIII.

A.
The appellant argues that the trial court erred to reversal by failing to excuse for cause three potential jurors. The appellant states that these jurors had a fixed opinion in favor of the death penalty, and that they therefore were not fair and impartial, as required by the Sixth Amendment and Art. 1, § 6 Alabama Constitution of 1901. However, the appellant did not challenge these jurors for cause or object to their not being excused. Therefore, this claim must be reviewed under the plain error rule. Rule 45A, Ala.R.App.P.
The record indicates that none of these jurors indicated that they would vote in favor of the death penalty regardless of the circumstances; each juror stated that he or she would consider the evidence and made a decision on the law and the facts.
"Even though a prospective juror may initially admit to a potential for bias, the trial court's denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law. Knop v. McCain, 561 So.2d 229 (Ala.1989); Siebert v. State, 562 So.2d 586 (Ala.Cr.App.1989), affirmed, 562 So.2d 600 (Ala.), cert. denied, *867 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Perryman v. State, 558 So.2d 972 (Ala.Cr.App.1989). Only when a prospective juror's testimony indicates a bias or prejudice so fixed or deep-seated that that person cannot be impartial and objective must a challenge for cause be granted by the trial court. Knop, supra; Siebert, supra; Perryman, supra."
Ex parte Land, 678 So.2d 224, 240 (Ala. 1996), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). See also Harrell v. State, 470 So.2d 1303 (Ala.Cr. App.1984).
A review of the record indicates that there was no error in failing to remove these jurors for cause.

XIX.
The appellant contends that the trial court violated his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and under Art. I of the Alabama Constitution by "repeatedly denying Wayne Travis discovery." Specifically, the appellant argues that the State at times provided discovery later than the date the trial court stipulated in its discovery orders; that the trial court refused to exclude the State's late discovery material; and that the court granted him a continuance of only 14 days after it vacated an earlier suppression order and ordered the State to maintain an open file policy. The State did not fail to disclose any Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) material, neither did it ultimately fail to turn over material discoverable under Rule 16, Ala.R.Crim.P., although it did not always do so as promptly as it should have.
In Thomas v. State, 508 So.2d 310 (Ala. Cr.App.1987), upon similar facts, this Court concluded that the appellant was actually challenging the timeliness of the State's compliance with the trial court's discovery order. The Court concluded:
"`The appellant provides no evidence that the untimeliness of the State's compliance prejudiced her case. Moreover, this court has found that even if the State failed to comply with an order for discovery, the items may still be admissible because the State offered the defense counsel an opportunity to inspect and examine them in accordance with Rule 18.5(a), Alabama Temporary Rules of Criminal Procedure. Clemons v. State, 491 So.2d 1060 (Ala.Cr.App.1986).'
"Robinson v. State, 528 So.2d 343 (Ala. Cr.App.1986)."
508 So.2d at 313.
With respect to the trial court's decision to allow the appellant a 14-day continuance, rather than the 60-day period that he requested, "[t]he trial court has discretion in determining whether or not to grant a continuance. McFarland v. State, 581 So.2d 1249 (Ala.Crim. App.1991). This Court will not reverse the trial court's decision in regard to a continuance absent a showing of gross abuse of the trial court's discretion. Johnson v. State, 542 So.2d 341, 343 (Ala.Crim.App. 1989)." Malone v. State, 659 So.2d 1006, 1011 (Ala.Cr.App.1995).
The appellant has failed to show how he was prejudiced by the untimeliness of the State's production or the lack of a 60-day continuance, and his argument is due to fail.

XX.
The appellant next contends that the trial court committed reversible error in granting the State's challenges for cause as to nine veniremembers, each of whom had stated that there were no facts or circumstances that could lead them to impose the death penalty in the event that the appellant was convicted of capital murder.
"`Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a *868 court's exclusion for cause of venirepersons who oppose the death penalty. The Court in dicta in Witherspoon limited exclusion for cause to those venirepersons who made it "unmistakably clear (1) that they would automatically vote against imposition of capital punishment ... or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Id. 522-23 n. 21, 88 S.Ct. at 1777 n. 21. Subsequently, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified or modified its decision in Witherspoon by holding that the state may exclude venirepersons in capital cases whose views would "`prevent or substantially impair the performance of [their] duties as a juror in accordance with his instruction and [their] duties as a juror in accordance with his instruction and [their] oath.'" Id., 469 U.S. at 424, 105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The new Witt standard dispensed with the Witherspoon reference to "automatic" decisionmaking, and eliminated the requirement that a venireperson's bias be proved with "unmistakable clarity." 469 U.S. at 424, 105 S.Ct. at 852.'
"Smith v. State, 698 So.2d 189, fn .5 (Ala.Cr.App.1996)."
Clemons v. State 720 So.2d 961 (Ala.Cr. App.1996).
Clearly, the excluded veniremembers each held views that would "prevent or substantially impair the performance of his or her duties as a juror in accordance with his instruction and his or her duties as a juror in accordance with his instruction and his or her oath," and were properly excluded from appellant's jury. Wainwright v. Witt, 469 U.S. at 423, 105 S.Ct. at 851-52.

XXI.
The appellant argues that the trial court erred in denying his motion to suppress and in subsequently admitting into evidence objects that were, he claims, the fruits of an illegal search. The appellant fails to state in his brief to this Court specifically what "illegal evidence" was admitted or to state a reason as to why the search was illegal.
"All evidence obtained by a search that is conducted in violation of the Constitution of the United States is inadmissible in a state court. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Loyd v. State, 279 Ala. 447, 186 So.2d 731 (1966). The Fourth Amendment to the Constitution of the United States bans all unreasonable searches. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Whether a search is unreasonable depends upon the facts and circumstances of the particular case. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Warrantless searches are per se unreasonable, unless they fall within a recognized exception. Ex parte Hilley, 484 So.2d 485 (Ala. 1985). Those exceptions include: objects in plain view, consensual searches, a search incident to a lawful arrest, hot pursuit or emergency situations, probable cause coupled with exigent circumstances, and a Terry `stop and frisk' situation. Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973). Where a search is executed without a warrant, the burden falls upon the State to show that the search falls within an exception. Kinard v.State, 335 So.2d 924 (Ala.1976)."
Ex parte Tucker, 667 So.2d 1339, 1343 (Ala.1995).
The search of the appellant was conducted subsequent to the shoot-out, and was incidental to a lawful arrest, made pursuant to probable cause coupled with exigent and emergency circumstances. The appellant did not have standing to *869 challenge the search of Clarene Haskew's stolen car:
"Whether a person has standing to contest the constitutionality of a search and seizure depends on whether that person has a reasonable expectation of privacy in the item(s) searched and/or seized. United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A general rule has developed, stating that a person's interest in his or her possession of stolen property is not a legitimate expectation of privacy society is willing to recognize as reasonable. See Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (fn. 4: Defendant's interest was `totally illegitimate'); United States v. Hensel, 672 F.2d 578 (6th Cir.), cert. denied, 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982); United States v. Hargrove, 647 F.2d 411 (4th Cir.1981); Smith v. Garrett, 586 F.Supp. 517 (N.D.W.Va. 1984); McMillian v. State, 65 Md.App. 21, 499 A.2d 192 (1985); People v. Mercado, A.D.2d, 114 A.D.2d 377, 493 N.Y.S.2d 896 (1985); Sanborn v. State, 251 Ga. 169, 304 S.E.2d 377 (1983); State v. Hamm, 348 A.2d 268 (Me.1975). See generally W. LaFave, 3 Search and Seizure Section 11.3 (1978). Alabama follows this general rule. See, Nelson v. State, 405 So.2d 392 (Ala.Crim.App. 1980), rev'd on other grounds Beck v. State, 396 So.2d 645 (Ala.1980), 405 So.2d 401 (Ala.1981).
Peoples v. State, 510 So.2d 554, 568 (Ala. Cr.App.1986), aff'd, 510 So.2d 574 (Ala. 1987), cert. denied, 484 U.S. 933, 108 S.Ct. 307, 98 L.Ed.2d 266 (1990).
The appellant had stolen the vehicle after murdering the owner. He had no standing to challenge a search of this vehicle.

XXII.
The appellant submits that the trial court erred by admitting into evidence what he alleges were extremely prejudicial photographs and a videotape of the victim and the crime scene, including the pentagram. The appellant contends that the photographs and videotape were cumulative of other evidence already admitted and that they served no purpose other than to inflame and arouse the passions of the jury.
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984)."
Ex parte Siebert, 555 So.2d 780, 783 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990).
*870 Moreover, as this Court recently held in Click v. State, 695 So.2d 209, 221-22 (Ala.Cr.App.1996):
"`Generally, gruesome photographs of a victim's body are admissible into evidence in a criminal prosecution if they are correctly identified and authenticated and: (1) tend to shed light on, (2) strengthen, or (3) illustrate the truth of other testimony. Additionally, they are admissible if they have a reasonable tendency to prove or disprove some material fact or issue in the case. Lewis v. State, 339 So.2d 1035, 1037 (Ala.Cr. App.), cert. denied, 339 So.2d 1038 (Ala. 1976).'
"Adkins v. State, 600 So.2d 1054 (Ala.Cr. App.), cert. denied, 600 So.2d 1072 (Ala. Cr.App.1992).
"Also, photographs that depict the character and location of external wounds on the victim's body are admissible even if they constitute cumulative evidence of an undisputed matter. Hines v. State, 365 So.2d 320, 321 (Ala. Cr.App.), cert. denied, 365 So.2d 322 (Ala.1978); Lovett v. State, 491 So.2d 1034, 1035 (Ala.Cr.App.), cert.denied, 491 So.2d 1039 (Ala.1986). Moreover, the admission of photographs in a criminal prosecution is within the sound discretion of the trial judge. Magwood v. State, 494 So.2d 124 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); Holland v. State, 424 So.2d 1387 (Ala.Cr.App.1982)."
In the present case, the photographs and videotape depicted information that was relevant and material to this case, especially in light of some of the issues raised earlier by the appellant in brief. The appellant argues that the evidence was insufficient to convict him of capital murder and to sentence him to death. He also argues that there was insufficient evidence to establish that the killing in this case was "especially heinous, atrocious, and cruel" when compared to other capital murders.
This photographic evidence, because it is relevant and material, would be admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984).

XXIII.
The appellant contends that the trial court erred to reversal by denying his motion to disclose the past and present relationships, associations, and ties between the prosecution and certain veniremembers. Although the trial court denied appellant's motion, it allowed the parties almost unlimited voir dire of the prospective jurors. Further, the State has no duty to disclose information to the defense that is available from another source; e.g., through voir dire examination.
Moreover, the appellant fails to name in brief any member of his venire whom he has subsequently learned had had a relationship with any member of the prosecution that might have caused such a person to have a natural bias in favor of the State. The appellant has failed to show in what manner he was prejudiced by the denial of his motion. See Ala. R.App. P., Rule 45. See also, DeFries v. State, 597 So.2d 742 (Ala.Cr.App.1992) (no error in denying motion to disclose past relationships where the same questions were allowed during voir dire at trial.)
Therefore, the appellant's argument must fail.

XXIV.
The appellant argues that the trial court committed reversible error by allowing the State to "death-qualify" his jury or, in the alternative, to allow the same jury that decided the guilt phase of the appellant's trial to also decide the penalty phase. The appellant asserts that this violates his constitutional right to a fair and impartial trial, in that death-qualified juries are more inclined than other juries to impose the death penalty.
*871 However, the State may properly ask the veniremembers questions pursuant to Witherspoon v. Illinois, supra, and Wainwright v. Witt, supra. The United States Supreme Court resolved this issue in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), holding that the Constitution does not bar the States from "death-qualifying" juries in capital cases, and that death-qualifying a jury does not deprive a defendant of a fair and impartial jury, and Alabama courts have consistently held likewise. Clemons v. State 720 So.2d 961 (Ala.Cr.App.1996); Williams v. State; Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993), aff'd., 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996); Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev'd in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App. 1987); Martin v. State, 494 So.2d 749 (Ala. Crim.App.1985); Clark v. State, 451 So.2d 368 (Ala.Cr.App.1984); Taylor v. State, 442 So.2d 128 (Ala.Cr.App.1983); McGinnis v. State, 382 So.2d 605 (Ala.Cr.App. 1979), cert. denied, 382 So.2d 609 (Ala. 1980).

XXV.
The appellant claims that the trial court erred to reversal in denying his request for funds for a public opinion pollster to assist him in arguing his motion for a change of venue. The appellant also contends that the court's denial of this motion prevented him from retaining a presentence expert, who would have presumably assisted him in developing mitigating circumstances for the penalty phase of his trial. In support of this claim, appellant relies on Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087 84 L.Ed.2d 53 (1985).
With respect to the appropriation of funds for an investigator, this Court stated the following in Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995).
"Section 15-12-21(d) provides that the state will reimburse reasonable expenses incurred in defending an indigent defendant on approval in advance by the trial court. In Dubose v. State, 662 So.2d 1189 (Ala.1995), the Alabama Supreme Court stated the rule as follows:
"`Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)] and Caldwell [v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)], taken together, hold that a defendant to be entitled to funds to pay for an expert, must show more than a mere possibility of assistance from an expert. Rather, the defendant must show a reasonable probability that an expert would aid in his defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial.
"`. . . .
"`....[W]e conclude that the principles enunciated in Ake, and grounded in the due process guarantee of fundamental fairness, apply in a case of nonpsychiatric expert assistance when an indigent defendant makes a proper showing that the requested assistance is needed for him to have "a fair opportunity to present his defense."'
"Dubose, supra, at 1194, quoting Ake, 470 U.S. at 76, 105 S.Ct. at 1092."
Bush v. State, 695 So.2d 70.
In Pace v. State 714 So.2d 320 (Ala.Cr. App.1996), this Court again stated that a defendant is entitled to funds for expert assistance with any issue the defendant shows is likely to become a significant factor at trial and for which the denial of an expert would result in a fundamentally unfair trial.
In the present case, the appellant has failed to show a need for the requested funds. Dubose v. State, 662 So.2d 1189, 1192 (Ala.1995). He presented no evidence *872 as to what this mitigating evidence might encompass or whether it was evidence or information that was unavailable to him or that required an expert.
As to his request for funds for a pollster to assist him in his motion for a change of venue, the proper method to determine whether a prospective juror is biased is through voir dire, not through opinion polls. Ex parte Grayson, 479 So.2d 76 (Ala.1985), citing Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App. 1978). See also Jackson v. State, 516 So.2d 726, 740 (Ala.Cr.App.1985).
The appellant has failed to establish that the denial of funds to hire a presentence report expert would deprive him of a fair trial because he has failed to state specifically how this expert would aid in his defense, Ake v. Oklahoma, supra; Caldwell v. Mississippi, supra; Dubose v. State, supra. The appellant claims in his brief to this Court that the lack of a presentence expert caused him to be unable "to present a jury with sufficient information to ensure that they made a reasonable determination of the proper sentence to be imposed upon conviction." The appellant fails, however, to state what information that he unsuccessfully sought, and why a presentence expert was necessary to obtain it. See Ake v. Oklahoma, supra; Dubose, supra. The appellant has failed to establish the need for a pollster because the same information was available to him at trial through voir dire examination. Ex parte Grayson, supra. The appellant's arguments are therefore without merit.

XXVI.
The appellant contends that the trial court's failure to grant his motion to invoke the rule before voir dire was reversible error. The appellant submits that the trial court never ruled on this motion, and that it was therefore implicitly denied.
During the trial of this case the court instructed the witnesses that they were not to discuss their testimony with other witnesses. The record does not reveal any instance in which the prosecutor advised a subsequent witness of the testimony of prior witnesses.
After the jury venire had been qualified and identified, it was determined, upon the suggestion of defense counsel, that a witness the State planned to call was present in the courtroom. Defense counsel requested that this witness be "excluded while we are asking questions of the jury." The trial judge overruled defense counsel's motion "at this time." The record does not reflect that any other request was made to invoke the rule. Considering the purpose behind "the rule," the trial judge was well within the exercise of his discretion in denying the defendant's motion. Gross v. State, 395 So.2d 485 (Ala.Cr.App. 1981).
The decision not to invoke the rule before voir dire is within the trial court's discretion. "`The decision to exclude or not to exclude witnesses from the courtroom remains a matter of discretion for the trial court.' Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991)." DeBruce v. State, 651 So.2d 599, 605 (Ala.Cr.App.1993), aff'd 651 So.2d 624 (Ala.1994).

XXVII.
The appellant filed a motion seeking disclosure of any and all information concerning prospective jurors that may be favorable to the defense. The appellant argues that the trial court's denial of this motion violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under the law of Alabama.
The appellant's motion does not specify the information sought; however, he was allowed to individually voir dire each member of his venire, and was therefore able to ask only appropriate questions regarding juror bias or prejudice. The *873 holdings in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) require the prosecution to disclose information exculpatory to the appellant or information that would lead to the impeachment of a State's witness. As to other evidence, such as whether a prospective juror sells drugs or drives while intoxicated, this information is available to the defense by other means, and the prosecution is not required to provide such information to the defense. Cooper v. State, 611 So.2d 460, 465 (Ala.Cr.App.1992).

XXVIII.
The appellant makes the general argument that the Alabama death penalty statute violates the Eighth and Fourteenth Amendments to the United States Constitution and Art. I of the Constitution of the State of Alabama. In support of this argument, appellant cites Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The appellant fails to specify which provisions he is relying upon; nor does he specify which aspects of the death penalty statute are defective or how they are unconstitutional. Moreover, he raised no similar objection at trial. Rule 45A, Ala.R.App.P.
Alabama's death penalty statutory scheme has been repeatedly upheld against constitutional challenges. See, e.g., Ex parte Harrell, 470 So.2d 1309, 1317-18 (Ala.1985); Smith v. State, 581 So.2d 497, 514 (Ala.Cr.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991); Coral v. State, 628 So.2d 954 (Ala.Crim.App. 1992), aff'd on return to remand, 628 So.2d 988 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Parker v. State, 587 So.2d 1072 (Ala.Crim.App.1991). Ex parte Jones, 456 So.2d 380 (Ala.1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985); Freeman v. State, 555 So.2d 196 (Ala.Cr.App.1988), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990); Tarver v. State, 500 So.2d 1232 (Ala.Cr.App.), aff'd, 500 So.2d 1256 (Ala.1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). Magwood v. State, 494 So.2d 124, 135 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); Boggan v. State, 455 So.2d 228, 239 (Ala. Cr.App.1984); Watkins v. State, 509 So.2d 1056, 1058 (Ala.Cr.App.1983), aff'd, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). There is no merit to this claim.

XXIX.
As is required by § 13A-5-53, Code of Alabama 1975, this Court must review the propriety of the appellant's conviction and his sentence to death by electrocution. The appellant was convicted of capital murder pursuant to § 13A-5-40(a)(2), Code of Alabama 1975, because the murder was committed in the course of a burglary. A review of the record reflects that the appellant's sentence to death was not the result of any influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Code of Alabama 1975. Moreover, the trial court specifically instructed the jury not to be influence by such emotions.
The trial court properly found the existence of two aggravating circumstances: that the murder was committed while the appellant was engaged in or was an accomplice in the commission of a burglary, and that the capital offense was especially henious, atrocious, or cruel when compared to other capital offenses. The trial court properly found the existence of two statutory mitigating circumstances: that the appellant has no significant history of prior criminal activity and that the offense was committed while the appellant *874 was under the influence of extreme mental or emotional disturbance. It further determined that these factors were entitled to "little weight." It also properly found that the evidence of nonstatutory mitigating circumstances concerning the appellant's character and his record was entitled to "moderate" weight.
According to § 13A-5-53(b)(2), Code of Alabama 1975, this Court must independently weigh the aggravating and mitigating circumstances. We have weighed all of the evidence presented in support of the aggravating and mitigating circumstances and are convinced that the appellant's sentence to death is appropriate and that the aggravating circumstances outweigh the mitigating circumstances.
As required by § 13A-5-53(b)(3), this Court must also determine whether the appellant's sentence is disproportionate to the penalties imposed in similar cases. The appellant's sentence is neither disproportionate nor excessive. For cases involving murder during a burglary, see Thomas v. State, 539 So.2d 375 (Ala.Cr. App.), aff'd, 539 So.2d 399 (Ala.1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989); Stewart v. State, 601 So.2d 491 (Ala.Cr.App.1992), affirmed as to conviction, reversed as to sentence, 659 So.2d 122 (Ala.1993); Wood v. State, 715 So.2d 812 (Ala.Cr.App.1996); Brooks v. State, 695 So.2d 176 (Ala.Cr.App.1996).
This Court has searched the record, as required by Rule 45A, Ala.R.App.P., for any error that may have adversely effected the appellant's substantial rights, and has found none.
Accordingly, appellant's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
All judges concur except COBB, J., who recused.
NOTES
[1] The appellant includes the name of Investigator Lawson as one of the witnesses to whose hearsay testimony he is objecting. It would appear from the record, however, that the appellant meant to use the name "Atkins," because this is the person under examination at that point in the record cited by him.